IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASE NO.: 1:26-cv-03685

RONALD J. CLOUTIER,
Address filed under seal;
PHILLIP M. CRAWFORD, JR.,
Address filed under seal;
BRUNO J. CUA,
Address filed under seal;
FRANK D. DAHLQUIST,
Address filed under seal;
NICHOLAS P. HENDRIX,
Address filed under seal;
JOSHUA D. KNOWLES,
Address filed under seal;
DANIEL F. LEYDEN,
Address filed under seal;
JOSEPH P. LEYDEN,
Address filed under seal;
GUY W. REFFITT,
Address filed under seal;
MATTHEW L. STICKNEY,
Address filed under seal;

Plaintiffs,

v.

UNITED STATES OF AMERICA,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Defendant.
______________________________/

**COMPLAINT PURSUANT TO THE FEDERAL TORT CLAIMS ACT**

The Plaintiffs, Ronald J. Cloutier, Phillip M. Crawford, Jr., Bruno J. Cua, Frank D. Dahlquist, Nicholas P. Hendrix, Joshua D. Knowles, Daniel F. Leyden, Joseph P. Leyden, Guy W.

Reffitt, and Matthew L. Stickney (hereinafter collectively referred to as the "J6ers"), by and through their undersigned counsel, hereby file their Complaint against the Defendant, the United States of America, and allege as follows:

## Jurisdiction and Venue

1. This Court has subject-matter jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (FTCA) and 28 U.S.C. § 1331 (federal question).

2. Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1402(b) because most of the acts and omissions giving rise individually to each of the Plaintiffs' claims occurred in this District, where the supposed infringements occurred at the Capitol and prosecutions were initiated, investigated, and litigated.

## Exhaustion of Administrative Remedies

3. Pursuant to 28 U.S.C. § 2675(a), the J6ers timely filed administrative claims with the United States, the Federal Bureau of Investigation or other appropriate federal agencies, and they have fully exhausted all administrative remedies required by the Federal Tort Claims Act ("FTCA"). More than six months have elapsed since the presentment of the SF-95 claim forms without final disposition by the agencies, or the claims were denied.

## Parties

***Plaintiffs***

4. Ronald J. Cloutier is a citizen of the State of Idaho.

5. Phillip M. Crawford, Jr., is a citizen of the State of Georgia.

6. Bruno J. Cua is a citizen of the State of Georgia.

7. Frank D. Dahlquist is a citizen of the State of Montana.

8. Nicholas P. Hendrix is a citizen of the State of Maine.

9. Joshua D. Knowles is a citizen of the State of Arizona.

10. Daniel F. Leyden is a citizen of the State of Indiana.

11. Joseph P. Leyden is a citizen of the State of Illinois.

12. Guy W. Reffitt is a citizen of the State of Texas.

13. Matthew L. Stickney is a citizen of the State of Washington.

***Defendant***

14. The Defendant, United States of America, is sued under the FTCA for the tortious acts and omissions of its employees, including Capitol Police, Washington, D.C., Metropolitan Police, Attorney General Merrick Garland, U.S. Attorney Matthew Graves, FBI Director Christopher Wray, and Assistant U.S. Attorneys Ashley Akers, Victoria Sheets, and Candice Wong, acting within the scope of their federal employment.

## The Biggest Crime in American History

***Prefatory Statement***

15. The J6ers are patriotic American citizens who witnessed, as did most of the nation, the reporting on the Presidential Election of 2020 (hereinafter referred to as the "Election"). As is explained below, each of the Plaintiffs knew and understood by what they saw and learned that the Election had been rigged and they were concerned that their country was being wrongfully taken.

16. On January 6, 2021 (hereinafter referred to also as "January 6th" or "J6"), the protesters who were in attendance on the Capitol grounds and/or in the Capitol building (hereinafter referred to as the "J6ers") innocently traveled to Washington, D.C., as they were anxious to learn whatever they could and to connect with like-minded patriots who had the same



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

concerns and who were there to peacefully protest the rigging of the Election. For almost all of the J6ers, their involvement was peaceful as they stood in groups who were in prayer and/or who sang patriotic songs such as God Bless America.

17. Unfortunately, the events which started peacefully turned into mayhem. On the West side of the Capitol Building, Metropolitan Police began to bombard the crowds with teargas and percussion grenades. Ultimately, they used SG gas, and everything went from bad to worse, resulting in four deaths and other injuries to J6ers, while the Capitol Police and the Metropolitan Police suffered only a few minor injuries, such as a broken finger.

18. J6ers were waved into the Capitol Building by the Capitol Police, and for the most part, they acted peacefully.

19. Yet, after the events of the day, false news was circulated of 5 deaths of police officers and accusations that the J6ers were insurrectionists. Ultimately, the Garland DOJ prosecuted the J6ers in dreadful ways, in conjunction with the District Court judges and magistrate judges who worked together to wrongfully imprison and wrongfully try and sentence innocent J6ers and others.

20. In this regard, only one Magistrate Judge showed any connection with those responsible for the rigging of the Election. Other than that one individual, who may or may not have influenced the rest of the D.C. federal bench, there is no evidence that the judges of the court consciously knew that they were aiding and abetting the enemy. The wrongdoing done by the bench was probably far more innocent than many suspect, as it was the nature and purpose of the occurrences on January 6th.

21. What the federal bench and the rest of the American people did not know was that the events which occurred on January 6th did not begin on that date. In fact, the breaking of the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

windows of the Capitol Building and the inducing of the J6ers to enter the grounds and the building had been planned long before Election Day.

22. To understand what occurred, one must zoom out to the proverbial 30,000 feet and understand the historical and global context of what occurred. The population of the United States is approximately 4% of the world's population, and yet it has approximately 27% of the global GNP. Following World War II, the United States has been the most powerful economy and military force on Earth and remains so to this day, despite foreign and domestic influences which are intended and determined to destroy the United States.

23. For many decades, the government of the United States encouraged endless wars, the export of our manufacturing base, and movement toward global governance.

24. As a result, foreign powers, especially China, prospered, and fundamental institutions of the United States became infiltrated by both foreign interests and domestic actors whose interests aligned with global governance.

25. Over time, in the last decades, global interests have infiltrated and become more common and more involved in different governmental agencies and normal American life, including the American educational system from K-1 through higher learning; the American traditional media; most of social media; aspects of big business; and certain churches.

26. Before Donald J. Trump came to office, although there were differences between the American political parties, each subscribed to these policies, supporting, for example, the U.N., W.H.O., the World Economic Forum, and globalism. Donald J. Trump presented a fundamental change to "America First" and to "Make America Great Again," or "MAGA," and a majority of Americans responded to the call to conservatism and nationalism.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

27. In effect, Donald J. Trump emerged to control the Republican Party which had its base disgorged, leaving that globalist minority known as "Republicans in Name Only" or "RINOs" as a minority. Meanwhile, the Democrat Party held the banner of globalism to the extent that its policies were extreme. For example, it embraced the U.N., W.H.O., the World Economic Forum, China, and open borders. In fact, it encouraged virtues of utopia, where all people are equal and programs such as being Woke, or embracing "Diversity, Equity, and Inclusion," or "DEI," were pitted against conservatism and making America First.

28. As a result of the dichotomy between the ways of Donald J. Trump and the Globalists, the nation became emotionally divided where hatred toward Donald J. Trump actually was given an unofficial but well-known psychological designation in the MAGA counterculture of "Trump Derangement Syndrome," and while the conservatives are constrained by beliefs which require adherence to the doctrines of religion, the U.S. Constitution, and the rule of law, the Globalists, though greatly outnumbered, are not so constrained.

29. As Donald J. Trump was consolidating his base in the Republican Party, the Globalists rose in influence and control of the Democrat Party, giving them more than a base. It gives them a means of gaining and taking control of the United States.

30. At this juncture, the Globalists have not only infiltrated the Democrat Party, but they have infiltrated all aspects of government, including members of our judiciary and the U.S. Department of Justice, and they are active.

31. While the social tide was changing in the United States, foreign states, primarily China, Venezuela, and Serbia, together with anti-American interests, such as George Soros, Bill Gates, and the World Economic Forum, encouraged their efforts to cause confusion among Americans which played into the divergence of values. DEI became the Woke philosophy with an



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

appearance of legitimacy for ideas which sometimes defied common sense. For instance, Boards of Education in various counties permitted and sometimes encouraged young children who were normal and capable of being influenced to believe that they were of the opposite sex. This liberalization grew to the point where male-to-female transitioners would participate in women's sports to break all kinds of records.

32. As another example of the incompatibility between the Left and the Right, whereas the Conservatives favor equal opportunities for all races, the Globalists seek repentance from Caucasian males for bad acts supposedly committed by some of their ancestors.

33. In 2016, Donald J. Trump won the Presidential race. Instantaneously, false narratives were made and given credence, such as the "Russia Collusion" accusations against President Trump. Some Globalist FBI agents considered a plan to have a special prosecutor appointed to be an "insurance policy." Mueller, who spent $30 million investigating, came up empty. Instead of unearthing Russian collusion and other crimes, Donald J. Trump was proven to have been law-abiding.

34. However, the 2016 election of Donald J. Trump did lead to a great deal of social unrest, and during the four years of his first term, a large percentage of Americans became susceptible to believing in positions contrary to the American way. These people formed a base in our society which foreign interests were able to wittingly and unwittingly enlist.

35. Worse were systems by those who governed China, Venezuela, Serbia, and others who developed machines with programs by which the outcome of the Election could be manipulated and determined.

36. Before 2020, the election equipment had been partially utilized, but in 2020, the foreign governments and all of their accomplices were set to rig the Presidential Election, and that



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

is exactly what occurred. The election was rigged, and all who participated directly were guilty of conspiring to overthrow the government of the United States by force, which was sedition pursuant to 18 U.S.C. § 2384; which was also the inciting, assisting, and engaging in insurrection against the authority of the laws of the United States, a conspiracy to commit insurrection pursuant to 18 U.S.C. § 2383; which was also adhering to the enemies of the United States and giving them aid and comfort by participating in the takeover of the United States to commit conspiracy to commit treason pursuant to 18 U.S.C. § 2381.

37. In the case at bar, the general meeting of the minds of groups which already existed, where the members of the groups, such as the D.C. Metropolitan Police, the Capitol Police, the lawyers who were part of the DOJ, the prison officials, and others who worked together for the common purpose of defeating the United States of America, or to cover up the rigging of the 2020 Presidential Election were guilty of sedition, insurrection, and treason.

38. As the enemies of the United States who participated in the massive foreign interference in the United States Presidential Election had made great infiltration of American Society, judges, attorneys, and other groups perhaps thought that they were doing a good thing by attempting to defeat the interests of the United States, but they were doing wrong, and acting against the interests of the government of the United States, which at the time was led by President Donald J. Trump.

***The Rigged Presidential Election of 2020***

39. This Complaint concerns a part of the planning, execution, and follow-up of the most widespread, most pervasive, most deep-seated, and, overall, the greatest anti-American conspiracy in history by American citizens and other domestic participants, who worked cohesively for the best interests of foreign powers and to take over the government of the United



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

States, not through overt military invasion, but rather by the insidious and surreptitious infiltration of the election system of the United States. The Americans who participated in this planning and execution of the planned events were participating in nothing less than a conspiracy to commit sedition, insurrection, and treason.

**The Development of the Enemy's Capability**

40. Following World War II, the United States became an avid opponent of tyranny and Communism, contrary to other nations including China and Venezuela, which had become adversaries to the United States before the turn of the 21st century.

41. In the early 2000s, the leader of Venezuela, Hugo Chavez, developed coding for voting machines by programmers located in Serbia which could control the results of elections which were tabulated on machines made in China for the companies of Sequoia and Smartmatic.

42. In the year 2000, in Florida, ballots for the Presidential Election used chads which ultimately led to a failure of public confidence in punch voting machines and a substitute was in demand.

43. Meanwhile, the President of Venezuela, Hugo Chavez, was extremely unpopular and had been developing voting equipment which could be programmed to cause the tabulation of the votes to be manipulated. In August of 2004, voting equipment was implemented in Venezuela for a recall election of President Chavez. Due to the machines, instead of being removed from office, Chavez won with 58% of the vote. By 2006, the machines programmed by Serbians for the Venezuelans had made their way to the United States where they were implemented for the 2008 Democrat primaries.

44. Over the next 14 years, the corrupted election equipment was sold to county clerks and other election officials throughout the United States. Contrary to what the companies,



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Smartmatic USA Corporation, Dominion Voting Systems, ES&S, and others, said, the machines were not "air gapped," meaning unable to communicate with other computers. In fact, the ES&S tabulators actually had phone chips, as cell phones do, on the motherboards, and Dominion equipment was connected through VPN connections.

45. After Donald J. Trump won the Presidential Election in 2016, and it was clear he was going to change the status quo in terms of ending perpetual wars and shifting power from those in the government who controlled decisions to the office of the President, deep state individuals, especially some in the Democrat Party, and foreign governments, including a number in the EU, Britain, and others, perpetrated a fraud on the American people accusing President Trump of collusion with Vladimir Putin. When that attack on the Trump government of the United States failed, accusation after accusation causing impeachment and criminal charges to be brought was part of the plan to return the government to one more friendly and cooperative to the goals of China, the EU, and Great Britain.

46. Ultimately, the direction of the free world, in fact, the whole world, was to rest on the question of whether Donald J. Trump would be reelected in 2020. As it was obvious that Donald J. Trump would have trounced his opponent, Joseph Biden, who campaigned from his basement and had a rally where 6 cars showed up, it became necessary for the foreign actors and domestic insurgents to use all efforts to rig the 2020 Presidential Election.

47. As a result, in 2020, the United States witnessed the "Summer of Love," which was a plan to implement civil unrest in Left-wing cities, for which paid activists were employed.

48. Moreover, in the autumn of 2019, a virus had been released from a laboratory in Wuhan, China. After the population of Wuhan was greatly infected, all commercial flights to all other cities in China from Wuhan were stopped. However, flights to the United States and Western



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Europe were encouraged. In this way, China intentionally attacked the United States with a biological weapon, knowing that it would cause massive deaths and a great change in the course of the 2020 U.S. Presidential Election.

49. As a result of the pandemic, states caused the rules to change, often illegally, and mail-in ballots were permitted to an extent which could change the results of the Election from ballot harvesting and other methods of cheating. The machines, though, had the power to determine the results of the elections by ginning up more votes than could ever be needed.

50. The rigging of the 2020 Presidential Election involved ballot harvesting and applying ballots in various races which were not provided by voters, either in person or by mail, but rather, were extra ballots prepared by criminals who put the ballots through the tabulators. Also, election equipment, such as the tabulators, although proclaimed by their manufacturers to be "air gapped," was connected to data centers which manipulated the vote tallies, either through actual phone chips on the motherboards of the tabulators or through virtual private networks.

51. On the evening of November 3, 2020, Election Day, in 4 swing states, Donald Trump was ahead, and for no known reason, even though the counting of ballots had never been previously stopped in any state, in the 4 swing states, the counting was stopped. Then, while the counting was supposedly not occurring, there were additional votes counted over an instant, causing the graphs of the voting in each of those swing states to show a straight vertical line for Biden. As a result, the following morning, in each of the 4 swing states, Joe Biden was suddenly ahead. In all 4 swing states, the graph was very similar where Joe Biden received approximately 97% of the vote, which was not only statistically impossible, but it was obvious to most that something untoward had occurred.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

52. Those who were not blinded by hatred toward Donald Trump were able to see instantly that the election results had been manipulated.

53. More evidence of the election fraud emerged, including the video from a camera which had been on the ceiling of the counting room in Fulton County, Georgia. There, the counting was stopped late on November 3, 2020, because of false reports of a broken water main. In fact, contrary to the excuse to stop the counting in Fulton County, Georgia, no water main broke or was in need of repair. After it was thought by the public that everyone left the counting room, 4 people remained behind, and they reached under the tables which were aproned to conceal what was under them. The 4 people in the room pulled hidden suitcases out from under the tables. They opened the suitcases which were filled with unfolded (therefore not mailed) ballots which they then proceeded to put through the ballot tabulators over and over again.

54. Those who looked objectively at these issues were not fooled, and they knew that the election system of the United States had been manipulated to give false conclusions of the tallies.

***Groups of Conspirators***

55. The individuals who created the theft of the Election involved leadership and actors who were engaged in ballot harvesting, manipulation of the adjudication of votes, and mainly in regard to the programing and manipulation by computers of the Election tallies. All of those individuals were seditionists and insurrectionists, and the American citizens who participated were traitors to the United States.

56. Over the last decades, more and more people have been swayed to help the foreign interests who are attempting to defeat the United States. For instance, the educational system of



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the United States is, to a great extent, now controlled by Globalist Woke leadership, which is politically engaged against the Trump government, which is the government of the United States.

57. This does not make all members of such groups seditionists, insurrectionists, or traitors. However, once 2 or more Americans agree to take action against the interests of the United States, and one of the group performs an act in furtherance of their anti-American activities, they are part of a conspiracy to commit an insurrection, and they are guilty of a conspiracy to commit treason.

58. In this regard, there are numerous actors who may have never met or conferred with the architects of the insurrection against President Donald Trump, but who acted in concert for the same ends. These include the group of individuals who planned the events of J6 or participated in the planning and execution of the events, and the prosecution of the aftermath.

59. When the police acted in concert against the J6ers, they were acting as conspirators to effect the foreign takeover of the United States by going along with the plan. In this regard, the FBI placed 274 agents and informants on the grounds of the Capitol to cause protestors to enter the Capitol Building. Responsibility for those events of J6, especially for inducing the J6ers to enter the building, went all the way to the top, including Attorney General Garland and Director of the FBI Wray, who were acting as co-conspirators against America, making them traitors to the United States.

60. The Assistant U.S. Attorneys who pursued the J6ers with a vengeance because the J6ers supported President Trump also were their own group of co-conspirators who committed treason.

61. The efforts of those who orchestrated the violence and the walking into the Capitol Building on January 6th were done so effectively that sensible law-abiding individuals,



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

such as the chief judge of the District of Columbia, in Washington, D.C., who laid down the way that J6ers' cases should proceed, were apparently convinced that the J6 Defendants in her courts were the insurrectionists who stormed the Capitol Building. It is difficult to blame her for her reactions to the events which were perpetrated to fool the whole of the American public. It fooled the judiciary, too.

62. As such, at best, the Federal District Court Judges and Magistrate Judges who went along with the wrongful conduct were playing into the hands of the true insurrectionists who had planned J6 well in advance of that date. There was no reason for the judges, at that point, to even imagine that someone had previously planned to break the windows of the Capitol Building, to enter the building, and to have 274 FBI agents and informants present to induce the crowd to proceed toward the Capitol Building and to enter it.

***The Planning of Related Events Relating to the Rigged Election***

63. The covert infiltration into our election system would not have been complete without finding ways of curtailing those of the U.S. population who were expected to question the results of the Election and possibly generate an effective opposition to those who rigged the Election.

64. Part of the plan was to identify and limit the effectiveness of those who could upset the proverbial applecart of the devised election rigging. In that regard, plans were made to prosecute American citizens in authority and their attorneys who would possibly undermine the new government, the Biden government which was to be put into place. As a result, certain individuals, such as Tina Peters, Stefanie Lambert, Matthew DePerno, and others, were prosecuted for alleged election-related crimes where the prosecutors had to twist the law because no crimes were actually committed. Those victims of the conspiracy were attempting to preserve



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the evidence or maintain the truth of what had occurred. They were heroic American patriots, not criminals.

65. Moreover, the companies which manufactured and/or sold the corrupted election equipment would file lawsuits against anyone who criticized their machines. Ultimately, lawsuits were filed against patriots such as Michael Lindell, Patrick Byrne, Joseph Oltmann, the Trump Campaign, and many more.

66. Of utmost importance, all the rest of the opposition to the preposterous idea that Joe Biden emerged from his basement to be the victor with more votes than Barack Obama received needed to be nipped in the bud with slogans such as calling allegations of election fraud the "Big Lie," getting all lawsuits claiming election fraud dismissed before any evidence was presented.

67. Some who were falsely put in trusted positions, but who were actually moles waiting to be utilized, such as William Barr, the Attorney General of the United States, suddenly took positions contrary to Donald Trump. William Barr, for instance, just prior to his appointment as Attorney General, had been a partner of the law firm Kirkland & Ellis, which represented Staple Street, which had purchased Dominion. He made public pronouncements that he did not see any indications of election fraud. Unfortunately, this was trickery, as he gave the impression that the Department of Justice looked for such fraud and was not able to find any. In fact, he was being deceptive in that he failed to also advise that he never looked.

***J6 was a Psy-Op***

68. Of all the plans to take over the United States by infiltrating our election systems, one of the greatest was to commit a psychological operation, a "psy-op" against the protestors who

the seditionists, insurrectionists, and traitors knew would be traveling to the Capitol Building in Washington, D.C., on January 6, 2021, the J6ers.

69. Although the foreign intervention in the election, itself, is not the subject of this Complaint, the conspiracy to wreak havoc at the U.S. Capitol on January 6th, and use those events to cause an aftermath of harm to those patriots who attended at the U.S. Capitol on that fateful date was planned in advance and executed according to plan as part of the general scheme to take over America.

70. The Globalists knew that those true to Donald Trump would be traveling to the U.S. Capitol to attend a protest planned for January 6, 2021, as they were the ones who saw and understood that the Election had been rigged. They were the equivalent to the "Early Adopters" who are the first to buy products with new technologies. Without Early Adopters buying products with new technologies, they would not succeed, and likewise, without the protestors who were early in accepting the truth of the rigged Election, the general public's opposition to the election rigging could not succeed. The psy-op was genius.

71. Long before January 6th, in fact, going back at least to September of 2020, active participants in what has been called the "Deep State" with various nongovernmental organizations ("NGOs"), including Globalists, Patrick Young, Lisa Fithian, Maria Stephan, and Erica Chenoweth, along with hundreds of others, actually knew January 6th was the date that the votes of the Electoral College would be counted and that Biden would be named as the winner of the election at the Capitol that day. These traitors conducted Zoom meetings to plan how the Globalists were to turn a peaceful protest of the conservative J6ers into the appearance of a riot.

72. Those seditionists, insurrectionists, and traitors, as early as August or September of 2020, long before the Election, itself, actually plotted to break some of the windows of the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Capitol Building so that their compatriots and foreign participants would enter the Capitol Building to unlock and open the doors of the Capitol so that the anticipated protestors outside would be herded into the Capitol Building.

73. The plan was a trap to identify and destroy the tip of the spear of opposition to the election rigging. It was a psy-op designed to stifle public outcry of the rigging of the Election, itself.

74. Others were involved, such as Nancy Pelosi, who, as Speaker of the House of Representatives, was responsible for the safety of the membership. When offered 10,000 National Guard troops, she rejected any help. She later admitted her responsibility.

75. These Globalists borrowed from the gamebook of Adolf Hitler, who, 28 days after he was appointed Chancellor of Germany on January 30, 1933, had his storm troopers burn down the equivalent of Germany's capitol structure, the Reichstag. By doing so, he was able to take absolute power and became the Führer within 60 days of his appointment as Chancellor.

***The Rigging of the Election Had Been Obvious to the J6ers***

76. After the Election, the Americans who supported Donald J. Trump could see that the Election had been rigged. To them it was obvious as no state in the country had ever stopped the counting of ballots after the counting began. Then, on election night of 2020, in 4 swing states in which Trump was ahead, the counting stopped (supposedly by coincidence), and in the morning, when the counting recommenced, Biden was in the lead in each state, with a staggering percentage of the votes which came in after the counting was suspended. For instance, in Michigan, after the polls closed, instantaneously, Donald Trump received 5,968 votes while in that fraction of a second, Joe Biden received 141,258 votes.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

77. In Arizona, 22,093 mail-in ballots were received the day before they were supposedly mailed.

78. In Fulton County, Georgia, the J6ers saw the video from the camera which had been mounted on the ceiling of the ballot counting room.

79. In Pennsylvania, the commonwealth mailed out 1,823,148 ballots and received 1,462,302 back. Yet, it counted 2,589,242 mail-in ballots, which were approximately 4:1 in favor of Joe Biden.

80. There is actually a wealth of evidence, at this point, but the point is that very early after the Election, people who favored Donald J. Trump began to file lawsuits, but they lacked standing. Approximately 60 lawsuits were dismissed without any judge examining any evidence.

***The Untoward Events Including Breaking of the Windows of the Capitol All Were a Great Success for the Globalists and Foreign Interests***

81. All went according to plan. President Trump encouraged protestors to go to the Capitol. The trap was set in what would prove to be the greatest and largest conspiracy in the history of the United States.

82. Many American patriots, including the J6ers, are citizens of different states who traveled to Washington, D.C., on or before January 6th in general support of President Donald Trump.[1]

83. At their own expense, they each traveled to Washington, D.C., and found accommodation so that they could attend speeches and rallies and gather at the U.S. Capitol to attend additional speeches and to assemble, pray, sing, learn, and protest their grievance of witnessing what seemed to be the demise of our country.

[1]Note that motivations varied widely, and some plaintiffs were motivated more by a need to raise awareness regarding various issues including public health overreach and/or election integrity generally.

84. With all of the trappings in place, the plans for January 6th were successful. The J6ers were cajoled, directed, and forced by GS gas and other insults to their bodies to enter the Capitol Building.

85. Many other incidents occurred, including the beating to death of Rosanne Boyland, the deaths of 2 J6ers as a result of concussion grenades being launched at them, and the horrendous death of Ashli Babbitt.

86. The circumstances of her death appear to have been pursuant to another, more specific plan to make the "riot"; there was a need for horrible things to occur. The film director and photographer John Sullivan just happened to be present with his crew to film the shooting, where supposed SWAT team members were present and then apparently changed their clothing after their parts in the performance were concluded.

87. The 274 FBI agents and informants who were present in the crowds were successful in concealing their true identities, and they succeeded in moving the crowds forward and into the Capitol Building, where they became susceptible to being charged with misdemeanors and potentially felony charges, as they later were.

88. The psy-op worked like a charm where the American people, including the judges in the D.C. federal courts, were outraged by the conduct which they understood to have been started by the J6ers.

***Pipe Bomb Fairy Tale, a "Gallows" Constructed with Government Permission, and a Scaffold Commander Urging Protestors to Move Forward***

89. Upon arrival at the Capitol on January 6th, the J6ers found themselves in a confusing setting, with no signs regarding scheduled events and few visible law enforcement



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

officers. A cheaply constructed "gallows" with a hanging noose had been erected by never-identified persons with apparent government permission.[2]

90. Although there were sections of minor fencing erected on the grounds early on J6, that fencing was mostly removed by afternoon, and the vast majority of the J6ers freely strode upon the Capitol Grounds without any obstructions or indications that they were not permitted to go there.

91. Capitol Police officials in league with the general conspiracy to harm the protestors later falsely testified at trials, at the direction of the Garland DOJ, that the Capitol was ensconced in near-fortress-like security.

92. Within minutes of the beginning of Congress' scheduled electoral vote proceedings, government officials announced that "pipe-bombs" had been found at nearby Republican and Democratic National Committee headquarters. It was the supposed finding of "pipe bombs," and not any conduct by any J6ers, that first caused proceedings at the Capitol to pause.[3] The story of pipe-bombs was constantly changing[4] and involved agents of the Capitol Police, Vice President-elect Kamala Harris, and the Secret Service. The pipe-bomb announcement triggered evacuations, closures, and shelter-in-place orders which ultimately culminated in a six-hour delay of Congress. All of this was later wrongfully blamed on the J6ers.

---

[2]Note that the gallows qualified as an installation and required a permit for placement on the Capitol Mall. The installation took more than an hour to set up, during morning hours before large crowds arrived.

[3]From another J6er's statement of facts: At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters. United States v. Tommy Allan, Case 1:21-cr-00064-CKK Document 1-1 Filed 01/20/21 Page 4.

[4]Christopher Wray's FBI fabricated or doctored video and released fabricated slowed-down, deliberately grainy footage of the "pipe bomber" to the public so as to prevent 'solving the crime' (while Wray's FBI was purportedly offering a large reward for the supposedly elusive 'bomber'). The "pipe bombs" themselves resembled stock dummy devices with less-than-one-hour kitchen timers. Private journalists later showed that Capitol Police bomb squad members knew precisely where to look for the "bombs"—obviously having foreknowledge. The FBI is known to have made several phone calls to The Blaze Media seeking to stop The Blaze's reporters from continuing their investigation.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***The Afternoon Unfolded According to Plan***

93. Not only did the seditionists, insurrectionists, and traitors in the Deep State and certain NGOs plan to break the windows of the Capitol Building, to have agents go into the Capitol through the broken windows, and to open the doors of the Capitol so that protestors who would be on the Capitol grounds could be directed into the Capitol building, but the FBI infiltrated the crowds which surrounded the Capitol with a united plan to move the crowds forward and ultimately into the Capitol Building. They had 274 agents and others under their control in place to accomplish this.[5]

94. Then, around 1:00 p.m. on January 6th, many of the Plaintiffs witnessed undercover FBI agents and CIs, etc., shouting to "Go! Go! Go!" commanding and directing the crowds to move forward, toward the Capitol Building. One instigator nicknamed the "scaffold commander" positioned himself on a scaffold tower with a megaphone, shouting at the thousands of protestors to move closer and enter the Capitol. Another never-identified instigator, wearing a red "MAGA" cap with a price tag still affixed, broke and smashed the first window of the Capitol on the West side, to allow infiltrators to climb through the windows. That was according to the plan of the seditionists, insurrectionists, and traitors who rigged the 2020 Presidential Election and then participated in and planned the events of January 6th, as a psy-op to dissuade organized challenges to the rigged election.

95. The identity of the instigators has been well known to Wray's FBI for years, and those instigators have been under Wray's and Garland's protection.[6] Also, the paucity of law enforcement security on January 6th was deliberate.

---

[5] In furtherance of their plan, the FBI kept secret the fact that they had 274 agents and confidential informants at the Capitol until September of 2025.

[6] Another similar example involves a mysterious man wearing a gas mask who pushed J6er Will Pope into the Capitol at the east side's carriage doors. Just as with Scaffold Commander, MAGA-hat guy and the pipe bomber, Garland's

96. As events unfolded on the Capitol's west side, Capitol police officers on the east side engaged in trickery with crowds of protestors, promising crowds (sometimes over megaphones) that police would try to help protestors approach more closely to the Capitol doors. When J6ers saw barriers removed on the east plaza, the protestors rushed forward, thinking officers had approved their advancement to the steps of the Capitol. Notwithstanding the obvious entrapment, the Plaintiffs were later charged with crimes for doing so.

97. When Capitol Police on the Capitol's west side repeatedly used force and possibly lethal force[7] on the J6ers, the festive or pensive milieu quickly changed. Metropolitan Police bombarded the crowds of peaceful protestors who had been praying and singing songs like God Bless America with percussion grenades, teargas, and rubber bullets, notwithstanding that they did nothing to provoke such an attack. Moreover, the Capitol Police caused bloody injuries to J6ers which further enraged the crowd and led to an escalation of violence in reaction and in self-defense.

98. During the events of that day, federal law-enforcement officers, including but not limited to officers of the Municipal Police Force and other federal agents, deployed chemical irritants (including pepper spray and tear gas), batons, flash-bang devices, and other less-lethal munitions against the Plaintiffs and the crowd without justification and in a manner that was excessive, unreasonable, and in violation of the Plaintiffs' rights.

99. Worse, at approximately 2:24 p.m., the Metropolitan Police were low on or out of teargas and percussion grenades. They were down to a box of CS Gas canisters. CS Gas is so horrific in its effects that it is a crime to use it in war. It causes severe inability to breathe, panic,

---

DOJ prosecutors claimed they possessed no information about the man who pushed Pope inside the building (making Pope the first J6er to breach the east side). But after three years and much diligent research by Pope, DOJ admitted that the gas-mask-wearing individual was known to the government and that the individual possessed a federal security clearance. See https://x.com/FreeStateWill/status/2006853257902305719 (accessed 1/2/2025).

[7] Capitol and Metro police officers, including Shauni Kerkhoff and Anthony Campanale, used "less than lethal" weaponry such as pepper ball guns in a manner that was lethal under the law, rules and training.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

high anxiety, and raw anger. A Metropolitan Police officer aimed a shot of a CS Gas canister at scaffolding on which some J6ers had climbed, but the wind caught the canister and took it to a line of Capitol Police, causing that line to break. Then the rest of the supply of CS Gas was shot into the crowds of protestors.

100. As a direct and proximate result of unlawful use of force, the Plaintiffs suffered injuries including chemical burns to eyes and respiratory systems, contusions, lacerations, and exacerbation of pre-existing conditions.

***The Largest General Search Warrants in American History***

101. Soon after January 6th, Attorney General Garland, U.S. Attorney Graves, and FBI Director Wray, in furtherance of the conspiracy to cause the protestors grave harm, and in furtherance of unseating the government of the United States with Donald J. Trump, President, violated Fourth Amendment limitations in their investigations of J6ers. These acts were all acts of sedition, insurrection, and treason. These federal officers crafted and used the largest and most general search warrants in history to identify every cell phone at the U.S. Capitol on January 6th. The warrants were so general that they didn't even try to state suspicion that any individual committed any specific crime, as the U.S. Constitution requires. Rather, the warrants simply listed a menu of ten to twelve possible crimes (including crimes which never occurred such as murder) and alleged that possessors of cell phones were either perpetrators or witnesses of such crimes. These federal officers used these unlawful search warrants to find and identify the Plaintiffs, despite having no probable cause at the time of the issuance of the warrants.

***Government-Funded Vigilante Stalkers***

102. Wray's FBI also funded and provided illegal material support to a private vigilante group, "the Sedition Hunters," who worked to identify and investigate J6ers by both

legal and illegal means. Among other things, Wray's FBI violated court orders by providing Sedition Hunters with court-protected discovery. J6ers such as Lyons and Williams were identified by this secretly government-funded vigilante group. J6er Allan was stalked by Sedition Hunters who repeatedly tried to get Allan fired from his job. J6er Abual-Ragheb was also stalked and harassed by Sedition Hunters, as were some of the Plaintiffs in this Complaint.

103. In support of the conspiracy to harm the J6ers, the FBI hid its support for Sedition Hunters for years, until after all J6er prosecutions ended and it was too late for J6ers to challenge illegal searches, stalking, and harassment.[8]

***Savage, Militarized, Pre-Dawn SWAT-Style Tactical Arrests Over Misdemeanors, Even for Those Whose Lawyers Said They Would Self-Surrender.***

104. In most ways the J6 protest demonstrations were similar to hundreds of other rallies and protests at the Capitol over generations. Under well-settled state and federal law, demonstrators at capitols and legislative assemblies were to be allowed to speak freely and be given avenues for expressing and demanding redress.[9] Even if accused of trespassing or other misdemeanors, protestors must be given multiple warnings and opportunities to depart or comply with commands.[10]

---

[8]See Ken Silva, "Online Sleuths who Hunted J6ers were FBI Informants," Headline USA, Jan. 21, 2026, https://headlineusa.com/online-sleuths-who-hunted-j6ers-were-fbi-informants-new-docs-reveal/.

[9]See D.C. Law, Ch. 3A § 5–331.03. Policy on First Amendment assemblies. "It is the declared public policy of the District of Columbia that: (1) Persons and groups have a right to organize and participate in peaceful First Amendment assemblies . . . and to engage in First Amendment assembly near the object of their protest so they may be seen and heard. . ." (2) "MPD shall not engage in mass arrests of groups that include First Amendment assemblies or that began as a First Amendment assembly unless MPD: . . . (B) Has issued an order to disperse . . ." See also ACLU, Demonstrating in D.C.: Know Your Rights (2025); Metropolitan Police Department, First Amendment Demonstrations (2021).

[10]See, e.g., Adderley v. Florida, 385 U.S. 39 (1966) (upholding trespassing convictions for student protestors at a jail, but unanimously stating that such protesting at a legislative capitol would be a defense to trespassing charges); Edwards v. South Carolina, 372 U.S. 229 (1963) (ruling that the First Amendment forbade state government officials to force a crowd to disperse when they are otherwise legally marching in front of a state capitol).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

105. FBI Director Christopher Wray and Attorney General Merrick Garland directed that FBI agents be diverted from serious, violent, and sexual crime investigations to focus on misdemeanor January 6th investigations.[11] In many cases, J6ers were subjected to early morning paramilitary arrest-raids despite previously contacting the FBI through attorneys to arrange peaceful meetings or surrenders.

106. Prior to January 6th, most FBI agents had never arrested anyone for misdemeanors (as such offenses are generally initiated by citations). However, in furtherance of the conspiracy to commit insurrection and sedition, Wray and Garland implemented the "shock and awe" program. They directed that armored FBI and paramilitary SWAT-style tactical teams with military equipment descend on the homes of J6ers who were accused of being misdemeanants. Wray and Garland directed that the raids be conducted in a terrifying manner, with explosives and battering rams and teams of agents displaying masks, helmets, body armor, and semi-auto and automatic rifles.[12]

107. Wray's agents smashed and tore off the Plaintiffs' doors and gates, using flashbang grenades to traumatize the Plaintiffs. Wray's agents also commanded that local police assisting in the terror raids turn off their body cameras, often in direct violation of local police policies. That was done so that there would be no evidence of how they treated the J6ers.

***Overzealous Prosecution As "National Security"***

108. Garland, Graves, Wray, and the other federal officials gave countless public statements describing the J6 demonstration in the course of their employment and accused the

[11] Note that such staffing decisions are administrative, rather than prosecutorial, decisions.

[12] Upon information and belief, no accused J6er (out of more than 1,500) offered any violent resistance or obstruction during these arrests and abusive raids.

J6ers of attacking the Capitol, Congress, and even democracy itself.[13] Those officials peppered their pleadings, complaints, and arguments with national security justifications and false defamatory language.[14] In accordance with this "national security" artifice, these officials spent the next four years feverishly preventing J6ers from arguing or even invoking the protections of the First Amendment.

109. Each J6 criminal prosecution began with government motions for protective orders, based on fake 'national security' grounds. The motions prevented J6ers and even judges from discovering the DOJ's concealed deceptions and fabrications, and they prevented the public from assisting J6ers. The DOJ falsely proclaimed that the locations of overhead cameras at the Capitol (which millions of people had seen while touring the Capitol) were so top secret that "national security" would be jeopardized if J6ers were able to share surveillance camera footage with the public.

110. The United States designated much of the discovery "sensitive" so that J6ers could only view it in the presence of their attorneys. This prevented many J6ers from putting on a defense because they lived at great distances from their attorneys.

111. The officials' true reason for demanding the protective orders was to keep the public from being able to identify undercover operators in the J6 crowds, which would have revealed the true scope of government entrapment and government distortion.

[13]Confirmation hearing, January 2021. When nominated, Mayorkas said if confirmed, he would do "everything I can" so that such an assault on the legislative branch and symbols of democracy would not happen again.

[14]See Luke Barr and Alexander Mallin, "AG Garland testifies Jan. 6 insurrection was 'most dangerous threat to our democracy,'" ABC News, May 12, 2021 ("Attorney General Merrick Garland told the Senate Appropriations Committee on Wednesday that he has not seen a more dangerous threat to democracy than the 'invasion' of the Capitol on J6, which he called in written testimony a 'heinous attack' and 'intolerable assault.'").



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***The "Capitol Siege" Section and The Application of Military Language And Techniques to J6 Investigations.***

112. The United States named the DOJ unit prosecuting the J6ers the "Capitol Siege Section," using terminology rooted in military strategy with no criminal-law meaning.[15] They established a website for the "Siege" section.[16] That unit, which was operating to support the sedition, insurrection, and treason against the President of the United States, ironically loaded its charging documents with military language, referring to the J6ers as the "insurrectionists" and focusing on "breaches" of "perimeters," and "storming" the Capitol. DOJ pleadings constantly referred to the demonstration as "the attack" on the Capitol.

113. Pursuant to their plan against the government of the United States, Graves, Garland, and other federal officials turned J6 prosecutions into acts of partisan warfare. They invited DOJ lawyers who politically opposed Trump and MAGA conservatives to relocate to D.C. and "join this mission" because they "believed in the defense of democracy."[17] Those prosecutors viewed their investigations, not as justice inquiries into crimes, but as a "criminal inquiry into efforts to stop the peaceful transfer of power."[18] They were used by the true seditionists, insurrectionists, and traitors who rigged the election and then assisted in squelching any accountability in their effort to take over America.

---

[15] A siege refers to a military operation in which armed forces surround a place, usually a fortified city or stronghold, with the goal of cutting off essential supplies and forcing the enemy to surrender.

[16] https://www.justice.gov/usao-dc/capitol-breach-investigation-resource-page (now defunct).

[17] Ryan J. Reilly, "Jan 6 prosecutors describe 'shocking' 'guttural' week after Trump's pardons," NBC News, Jan. 24, 2025, https://www.nbcnews.com/politics/justice-department/jan-6-prosecutors-describe-shocking-guttural-week-trumps-pardons-rcna188970 (accessed 10/1/2025).

[18] Ryan J. Reilly, "As Jan 6 probe expands, officials worry DOJ resources are at a breaking point," NBC News, July 29, 2022, https://www.nbcnews.com/politics/justice-department/jan-6-probe-expands-officials-worry-doj-resources-are-breaking-point-rcna40208 (accessed 10/1/2025).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***Involvement of the "National Security Division"[19]:***

114. Garland, Graves, and the other DOJ officials collaborated with the "National Security Division's Counterterrorism Section" on many J6 prosecutions, treating the cases as counterterrorism efforts.[20] Garland, Graves, and other officials explicitly proclaimed that J6 verdicts were obtained through the "National Security Division's Counterterrorism Section."[21] J6 convictions were described as "battlefield victories." DOJ spokesmen proclaimed that the DOJ was bringing "accountability to [J6ers] who attacked our democracy on January 6." The United States' use of the Joint Terrorism Task Force invoked national security weaponry over matters that had nothing to do with terrorism.

***Selective Targeting and Prosecution of J6ers***

115. Over the years, similar or even greater intrusions by demonstrators at the Capitol had been punished with $25 or $50 fines, even for protestors who forcefully occupied Capitol spaces and refused and resisted orders to leave or remove them. However, the officials in this case selectively prosecuted the Plaintiffs herein with unique charges never applied in similar circumstances, which were vindictively escalated to life-crushing felonies for the vast majority who insisted on trials.

---

[19]Note that the DOJ's "National Security Division" has a stated mission which strays markedly from a pure prosecutorial mission: "The mission of the National Security Division is to protect the United States from threats to our national security by pursuing justice through the law. The NSD's organizational structure is designed to ensure greater coordination and unity of purpose between prosecutors and law enforcement agencies, on the one hand, and intelligence attorneys and the Intelligence Community, on the other, thus strengthening the effectiveness of the federal government's national security efforts."

[20]For example, in a January 6, 2025, press release on the San Diego U.S. Attorney's Office's role, GARLAND's DOJ stated: "These cases are being prosecuted through a collaboration led by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."

[21]See, for example, GARLAND's November 7, 2023, press statement: "This case is being prosecuted by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

116. Similarly situated individuals—those who engaged in violence, property destruction, or disruption of government functions during 2020 protests—were not prosecuted with comparable vigor or at all. That selective enforcement was based on the Plaintiffs' political viewpoints and was orchestrated at the highest levels of the DOJ and FBI who participated in the sedition, the insurrection, and the treason to take over the United States.

117. Even past demonstrators who had disrupted the precise, identical proceedings on prior[22] January 6th dates had been given $50 fines. Three protestors arrested on Jan. 6, 2017, got $50 fines for disrupting the identical certification ceremony. There were no claims of Secret-Service "restricted areas" for such demonstrators, despite the presence of VP Biden.

118. There were even demonstrators who committed the precise, identical conduct of picketing or parading at the Capitol alongside and surrounded by J6ers, who never feared arrest because they were anti-Trump, pro-Biden protestors. For example, a pro-government extremist demonstrator named Patricia Eguino was never arrested by the Biden DOJ because she was a Democrat, despite Ms. Eguino brazenly holding political pickets on January 6, 2021, on the upper east terrace of the Capitol. Those around Ms. Eguino were prosecuted; Ms. Eguino was not.

119. Even demonstrators at the Capitol who forcefully or violently disrupted official proceedings in years past were given $50 fines, if prosecuted at all. Several notorious pro-Democrat protestors have been detained many times each for obstructing congressional proceedings, but were never prosecuted for 20-year felonies.

[22]See Zoe Tillman, "Protesters Arrested As Congress Certifies Trump's Victory," Buzzfeed News, January 6, 2017, https://www.buzzfeednews.com/article/zoetillman/protesters-arrested-as-congress-certifies-trumps-victory (accessed 1/10/2026) (saying protestors Renaldo Pearson, Tania Maduro, and Ryan Clayton "were each charged with one count of disruption of Congress, a misdemeanor that carries a maximum penalty of six months in jail." "The protesters were released Friday evening after posting and then forfeiting $50, a process under District of Columbia law available for certain low-level misdemeanors that resolves the charges.").



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

120. The officials herein turned a routine Capitol protest and 6-hour delay[23] of Congress into the largest and most expensive investigation in American history, with an overarching aim of chilling and suppressing the expression of particular viewpoints and grievances. The officials fabricated evidence, concealed and withheld exculpatory evidence, made knowingly false statements in affidavits, pleadings,[24] and official proceedings related to the Plaintiffs' prosecutions, and exaggerated, concocted and manufactured threats and injuries, to secure wrongful charges, convictions and sentencings.

121. Note that the systematic targeting of a class of people due to affiliation with a politically unpopular or ousted ideology is administrative rather than prosecutorial conduct. Reno v. AADC, 525 U.S. 471 (1999). Participation in silencing dissent about the rigging of the Election was a carrying out of the aims of the conspiracy to commit sedition, insurrection, and treason by all involved.

122. Moreover, the conspiracy was committed by learned judges who were onboard to make sure that the sentences for J6ers were by far the harshest in U.S. history for political protesting, rioting, or demonstrating of any kind. Indeed, the longest prison sentences for J6ers were many times longer than those for any comparably situated political demonstrator or rioter in history, and the first, second, and third highest individual misdemeanor fines in U.S. history were

---

[23]Note that other protests at the Capitol have shut down Congress for much longer periods. For example, the Kavanaugh confirmation protests in 2018 stopped and disrupted proceedings for days. The May Day protests of 1970 also disrupted Congress for days. The Bonus Army occupation of 1932 shut down congressional proceedings for many days.

[24]The Statement of Facts presented by the government in Tommy Allan's case is illustrative: "Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. . . At least one of the subjects carried a handgun with an extended magazine." Each of these statements is false. The most serious injury to any officer was a broken finger. The most common injury was "pain." No officers died as a result of injuries from J6. No member of Congress was ever in the same room as any demonstrator. No J6er was ever accused of entering the Capitol with a firearm. United States v. Tommy Allan, Case 1:21-cr-00064-CKK Document 1-1 Filed 01/20/21 pp. 5–6 (emphasis added).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

all imposed on J6ers.[25] Perhaps, some judges should be investigated and prosecuted for their horrendous conduct. No recommendation as to judges is being made, but treason is treason, and donning black robes should not protect anyone from being charged with treason if it is a crime committed.

123. Wray's FBI illegally placed J6ers on Terrorist Watch Lists and "SSSS" flight restrictions which subjected them to extra security measures during air travel, including strip searches.

124. The United States debanked and facilitated the debanking of J6ers so that J6ers were denied access to credit institutions. The United States also secretly directed and facilitated the deplatforming of J6ers from social media.

125. Acts such as spreading disinformation, imposing a program of shock-and-awe[26] pre-dawn paramilitary SWAT-style raids to terrify and traumatize arrestees (causing numerous suicides, attempted suicides and miscarriages), setting up a snitch line to maximize arrests and social division, staging deployments of explosives against accused misdemeanants,[27] certifying the world's most expansive general search warrants in history without probable cause,[28] materially

---

[25]J6er Rebecca Lavrenz now holds the all-time record with a $103,000 fine. The second heaviest fine in history for a misdemeanor was levied on another J6er, Brady Knowlton ($75,000). Third place seems to be a tie with a criminal defendant named Robert J. Brenna Jr. (New York) who paid a $25,000 fine in 2003 for violating the Clean Water Act (the highest until January 6). J6er Paul Johnson's $25,000 fine apparently tied Brenna's 2003 fine for third place.

[26]See Scott Pelley, "Inside the prosecution of the Capitol rioters," 60 Minutes, March 22, 2021, https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/ (accessed 5/19/2025) (Acting U.S. Attorney Michael Sherwin explained that "our office wanted to ensure that there was shock and awe …. And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, 'If we go there, we're gonna get charged.'"); Jonathan Turley, "How Prosecutors Turned January 6 Rioters into Martyrs," New York Post, Jan. 20, 2025, https://nypost.com/2025/01/20/opinion/how-prosecutors-turned-january-6-rioters-into-martyrs/ (accessed 5/18/2025) ("The Justice Department set out to send a chilling message to the nation. In an interview with CBS News a year later, Justice Department official Michael Sherwin indicated that they wanted to send a message with the harsh treatment of defendants.").

[27]See Burns v. Reed, 500 U.S. 478 (1991) (prosecutors do not have absolute immunity when giving legal advice to police regarding the investigative stages of the case, as such conduct is more administrative/investigative).

[28]See Kalina v. Fletcher, 522 U.S. 118 (1997) (certifying facts in an affidavit for probable cause was not entitled to absolute immunity—only qualified).

supporting private vigilante groups to hunt down suspected J6 demonstrators, throwing out settled pretrial detention standards to keep nonviolent J6ers behind bars without convictions,[29] placing Americans on watch lists, facilitating the debanking of U.S. citizens, concealing and withholding the role and numbers of undercover government operatives and informants among demonstrators on January 6th, applying constrained 20-year-prison "obstruction-of-official-proceeding" charges to political demonstrators, punishing J6ers who refuse to plead guilty with retaliatory charges commanding 40-times-greater sentences, and threatening or arresting defense witnesses to prevent the J6ers from defending themselves are administrative, "national security," and investigatory conduct, not prosecutorial advocacy.

***Prosecutors***

126. Acting U.S. Attorney for D.C. Michael R. Sherwin was responsible for organizing his Assistant U.S. Attorneys ("AUSAs") and, pursuant to the plan to take over the United States, attempted to blame President Donald J. Trump for sedition, when he, himself, ironically, was actually the one who was guilty of the claim.

127. John Crabb Jr. was the Chief of the Criminal Division of the Office of the U.S. Attorney in D.C. and was the direct supervisor of Thomas Windom on the January 6th Detail. J.P. Cooney acted as Deputy Special Counsel to Jack Smith. These two commenced investigations

---

[29] In February 2021, the DOJ worked with Chief Judge Beryl Howell to create guidance for whether J6ers should be granted pretrial release. This guidance was known as the "Chrestman 6" (or "Chrestman factors"). United States v. Chrestman (Case No. 21-mj-218). Howell granted the government's motion for review of a magistrate's pretrial release order, stayed the release, and ultimately ordered pretrial detention. The six factors were (1) felony or misdemeanor, (2) "the extent of the defendant's prior planning," (3) whether the defendant used or carried a weapon, (4) evidence of coordination with other protesters, (5) whether the defendant played a leadership role, and (6) the defendant's words and movements during the riot. This framework helped keep nonviolent J6ers in jail indefinitely; J6ers needed to plead guilty or be held through trial. It was the first time an entire category of defendants was subject to special bail rules that didn't apply to others. And the Chrestman factors added factors for pretrial release beyond what the Bail Reform Act required. And the Bail Reform Act, 18 U.S.C. § 3142, enacted during the tough-on-crime Reagan presidency, was itself controversial for expanding pretrial detention. See United States v. Salerno, 481 U.S. 739 (1987).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

against President Trump and "individuals within his orbit" regarding the lead-up to J6, in their attempt to accuse Donald Trump of insurrection, and offered false testimony to the J6 Select Committee. One of the worst conspirators who conspired with Jack Smith as his deputy was Molly Gaston, who took pride in announcing that a grand jury had returned a true bill in August of 2023 against President Donald J. Trump.

128. Gregory Rosen was the Chief of the Capitol Siege Section, Breach and Assault Unit in the office of the U.S. Attorney for D.C. His office worked in conjunction with the above-named conspirators. He worked together with Prosecutors Carlos Valdivia and Samuel White who, in a Taranto sentencing memorandum which they filed, described J6 as "a mob of rioters," consistent with the needs of the seditionists, insurrectionists, and traitors to the United States. Their work was part and parcel of the destruction of the tip of the spear of objections to the election which had been rigged.

***Judges Joined the Prosecutors in Subjecting J6ers to Unprecedented Treatment.***

129. The most disappointing aspect of the takeover of the United States by foreign forces and Left Wing/Globalist extremists was the way that the vast majority, but not all, of the District Court Judges and Magistrate Court Judges were united between themselves in the District of Columbia to destroy the lives of the J6ers. All of their actions were done beyond the bounds of reason and were unwittingly in furtherance of the purpose of sedition, insurrection, and treason against the United States of America. This was a demonstration of how effective the Globalists were in misleading the public and the judges. It is completely understandable that a judge who saw and watched and then saw accounts of what occurred on J6 would think that the J6er on trial was evil. Unfortunately, the judges were all fooled into believing the scenario which appeared to be real, but was not.

130. Of all of the judges, though, there was one who knew or should have known the truth, U.S. Magistrate Judge Moxila A. Upadhyaya who was one of the most extreme in her anti-J6er rhetoric and rulings. She was surely a fox in the henhouse who had her own goals and agenda. Prior to her being appointed as a Magistrate Judge, she was an attorney who represented the one who was the key to exporting election equipment and its insidious programing designed to control the results of the Election, the President of Venezuela, himself, Maduro. Maduro was her client. Her conflict of interest was not only real. It was extreme. The J6ers were 100% opposed to the one responsible for rigging the Election and that was Magistrate Judge Upadhyaya's former most important client.

131. Not all, but almost all of the D.C. District Court judges and the Magistrate Judges willfully acted under the color of law to deprive J6ers of their rights, including due process and their First Amendment rights.

132. The judges of the D.C. District and Circuit were witnesses to the events of J6, because the U.S. Prettyman Courthouse is adjacent to the Capitol Grounds and the judges had watched the events from their courthouse windows.[30] Normally such personal observation of supposed crimes would require recusal or transfer of venue. Nonetheless, the judges uniformly denied motions to disqualify them or to change venue.

133. Forcing J6ers to defend themselves in D.C. meant that the proceedings were tilted in favor of the prosecution. Polls showed that D.C. residents regarded themselves as victims of J6ers and prejudged J6ers to be guilty. Polls also showed that D.C. residents wanted J6ers punished by life imprisonment or the death penalty.

[30] During closing arguments in the biggest J6 trial, the Proud Boys trial of December 2022–April 2023, prosecutors finished by drawing jurors' attention to the proximity of the courthouse to the action of J6. This was intended to impress upon the jurors a sense of personal fear and attachment to the facts of the case.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

134. Moreover, the residents' local elected officials had all made points of singling out J6ers for abuse. D.C. city officials had even held town hall lectures and park presentations against J6ers. The D.C. mayor had issued parking bans and requests for businesses to shut down in advance of J6. The D.C. mayor also ordered businesses to close early on the evening of J6. (Later, J6ers would be prosecuted under 18 U.S.C. § 231 for adversely affecting commerce, and prosecutors even presented business managers as witnesses to the J6ers' supposed harm to the economy—bearing profit/loss data.)

135. The judges of the D.C. District also agreed with prosecutors that J6ers could never offer evidence regarding the improprieties of the 2020 presidential election. This was basic exculpatory evidence regarding innocent motive. But these judges' rulings did not stop the judges themselves from pronouncing, as supposed fact and law, that the 2020 election was properly won by Joe Biden as an aggravating factor at sentencings.

***The United States' Novel Theories of Law and Abuse of Statutes To Maximize Imprisonment of Plaintiffs.***

136. The United States, which had been taken over by foreign and domestic forces who continued the conspiracy of sedition, insurrection, and treason against the United States, used novel theories of law[31] to target the Plaintiffs for false charges such as "obstruction of official proceedings" and "entering and remaining in a restricted area."

[31] For example, many J6ers who merely walked or stood in places were convicted of "disorderly conduct" based on a theory (the "raindrop theory") that Jan. 6 protesters shared equal guilt for rioting, like raindrops that join to create a flood. See, e.g., United States v. Rivera, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field."). The government also used "Seditious Conspiracy" charges against Oath Keeper and Proud Boy leaders based on a notion that U.S. citizens protesting the outcome of an election qualified as an attempt to "overthrow" the government.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

137. While there are federal trespassing statutes which explicitly apply to the U.S. Capitol,[32] such statutes provide only a petty offense and plainly exempt mere presence in public areas where most J6ers walked and demonstrated. For Garland and Graves to act according to their plan, they chose to use an ill-fitting Secret-Service "restricted area" statute, 18 U.S.C. § 1752(c)(1)(B), to maximize penalties and imprisonments of the Plaintiffs. However, § 1752 focuses on the authority of the Secret Service (SS) to create temporary restricted areas around certain federal protectees.

138. The use of the § 1752 statute required constant deception and fabrication of claims and evidence by DOJ prosecutors. Knowing that the Secret Service had never formally "restricted" the Capitol on January 6th, and knowing that any designations or indications were insufficient, Garland and Graves' prosecutors retreated to a contrived argument that the Capitol Police had restricted the Capitol on January 6th on behalf of the Secret Service.[33]

139. While the D.C. Circuit later upheld this artifice,[34] at trials of J6ers, prosecutors presented a preposterously large, "restricted area" concept map around a single protectee (Vice President Mike Pence) (who was as far as a half-mile or more away from most J6ers at any given time).[35]

---

[32] 40 U.S.C. § 5104(e)(2) Violent entry and disorderly conduct.--An individual or group of individuals may not willfully and knowingly-- (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House; (B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House; (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of-- (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress;

[33] At J6 criminal trials, GARLAND and GRAVES (DOJ) presented nothing but a memo announcing a construction closure on the west side and a series of emails announcing the scheduled movements of V.P. Pence as supposed evidence of the "restrictions."

[34] United States v. Neely, No. 23-3166 (D.C. Cir. Dec. 27, 2024) (affirming J6 defendant Darrell Neely's conviction under 18 U.S.C. § 1752(a)(1) despite the fact that the restrictions had not been designated solely by the Secret Service).

[35] Note that for a year, the first J6 indictments falsely alleged there were TWO Secret-Service protectees at the Capitol: Kamala Harris and Mike Pence. But it was finally revealed that Kamala Harris had been at the DNC headquarters

140. Garland and Graves' use of § 1752(c)(1)(B) yielded absurd results. For despite the Garland DOJ's concocted claim that the Capitol Police were proxies for the Secret Service in "restricting" the Capitol on January 6th, the Garland DOJ simultaneously argued that the Capitol Police had no authority to 'unrestrict' any area of the Capitol, such as by opening doors, opening barricades, or inviting J6ers into the Capitol.

141. Certain unknown officers of the Secret Service were also part of the conspiracy to knowingly and deceptively delete all text messages relating to the matters of January 6th, to prevent the Plaintiffs and the public from knowing the truth and to assure that the evidence was not available to those charged for violations of law.

142. As a result, many innocent J6ers (including many of the Plaintiffs) were wrongly convicted through trickery as well as entrapment.

143. Thus, each J6 criminal prosecution was a collection of planned absurdities and fabrications. In J6 trials, prosecutors were also part of the conspiracy. They asserted that the mere presence of whiffs of smoke or pepper spray or sounds of alarms ringing, or even the sight of rolls of plastic fencing lying on grass nearby was proof of the mythical "restrictions."

144. There is no way that the prosecutors, under Graves' supervision, did not knowingly deceive jurors and judges by emphasizing signs which were not seen by individual J6ers, but which had been erected and then taken down hours before J6ers arrived, or were hundreds of yards away, or lying on the ground.

during the time and not at the Capitol. Upon information and belief, government officials had secretly staged a false flag operation involving Kamala Harris and government-placed "pipe bombs" at the DNC. But for reasons unknown, these government officials had canceled the scripted pipe bomb event or altered their intended storyline. Of course, this means that for an entire year, the United States presented false statements and fabricated evidence to grand juries regarding the location of V.P.-Elect Harris. Throughout 2022, the DOJ returned to the grand juries to obtain superseding indictments to correct this false information. The Secret Service deleted all text messages relating to these matters so as to obscure the truth.

***They Were Out to Destroy J6ers***

145. This was all part of the plan to repress the J6ers and the other waves of concerned Americans who would have followed. The plan was to cause as much harm to all J6ers, including the Plaintiffs, as possible, to destroy their lives in every way possible. The point was that to make examples of the J6ers and blame them for being rioters and insurrectionists, they would lose all credibility and their freedom to continue to protest. This was the leading edge of stemming opposition to the rigged election. Worse, the plan worked.

146. While the J6ers were on the grounds, Metropolitan Police used percussion grenades, rubber bullets, teargas, and ultimately CS Gas on the J6ers, and sprayed them in the face with pepper spray as they pushed them into the Capitol Building.

147. Then, months later, instead of making peaceful arrests, where J6ers would have surrendered themselves voluntarily, even where J6ers offered through counsel to be voluntarily arrested, the conspiracy dictated to do the most harm possible by smashing in the front doors of their homes in the early morning hours and then pulling them all out of their houses sometimes in frigid weather in their underwear and then holding them at gunpoint. Parents who had to stand were almost paralyzed for hours while their homes were ransacked as they stood watching the red dots from the laser sights of the guns and rifles on the chests of their children.

148. The misuse of the court system was to an extent where the District Court Judges and Magistrate Judges in Washington, D.C., became either wittingly or unwittingly part of the whole conspiracy.

149. For those who were imprisoned, in many circumstances, they were put in solitary confinement for extended periods because they were J6ers. In many circumstances, prison



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

populations were falsely told that the J6ers were white supremacists, and prison guards were falsely advised that the J6ers were responsible for the deaths of 5 police officers.

150. Every effort was made to destroy the lives of as many J6ers as possible and give them the harshest of all possible prison existences.

***The Government's Misuse of 18 U.S.C. § 1512(c)(2)***

151. Merrick Garland's Department of Justice also maliciously utilized a felony punishable by 20 years' imprisonment, "obstruction of an official proceeding" under 18 U.S.C. § 1512(c)(2), to punish J6ers who refused to immediately plead guilty to lesser charges, among other things.

152. From January 7, 2021, to January 20, 2025, Wray, Garland, and Graves maliciously prosecuted the Plaintiffs with the bogus charge, "obstruction of an official proceeding" under 18 U.S.C. § 1512(c), without probable cause.

153. The statute was drafted by Congress as part of the Sarbanes-Oxley Act of 2002 following the accounting and auditing fraud revelations involving Enron and Arthur Andersen LLP. The legislative intent of the Act was that it was supposed to apply to evidence-destruction, bribery, or witness tampering associated with corruptly influencing official proceedings, resulting in erroneous outcomes.

154. Conspiracist Garland's prosecutors deployed the statute as an extremely punitive disorderly conduct law and a tool for compelling innocent J6ers to plead guilty to crimes they didn't commit. Prosecutors admitted that they used the same evidence for § 1512 prosecutions as they did for misdemeanor disorderly conduct prosecutions. However, they used the threat of §



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

1512 prosecutions to punish J6ers who defended themselves.[36] Moreover, the chilling shockwaves of these vindictive charging decisions reverberated throughout the J6er community, causing many innocent J6ers to falsely plead guilty to crimes they didn't commit.

155. The Supreme Court recognized the United States' improper use of § 1512 on June 28, 2024, striking down the application of § 1512(c)(2) except in cases where "the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in an official proceeding." Fischer v. United States, 603 U.S. __ (June 28, 2024).

---

[36] At least three dozen J6ers (at least 66 percent of all alleged misdemeanants who demanded trials) were charged with the bogus felony charges when they turned down misdemeanor plea offers. Tommy Frederick Allan, John D. Andries, Stephanie Baez, and Richard Barnett were charged with misdemeanors and then charged with felonies in superseding indictments. (Sentenced to 45 mos.) Damon Michael Beckley, James Bonet, Larry Brock, Therese Borgerding, Dominic Box, Sara Carpenter, Jenny Cudd started with two misdemeanors, which were quickly superseded with felony charges when Cudd indicated she would defend herself. David Davis, Derrick Evans, Simone Gold, Daniel Goodwyn, Derek Gunby, Brian Gundersen, Joseph Irwin, Leo Kelly, Deborah Lee, Larry Ligas, Kevin James Lyons, and Patrick Montgomery all had similar experiences. Darrell Neely was initially charged with 5 misdemeanors, then superseded with felony § 231 counts after declining plea offers (ultimately acquitted at trial of the felony § 231 count). Michael Oliveras was charged with 4 standard misdemeanors on 12/8/21. A year later, after rejecting a plea, Oliveras was charged with a felony § 111 assault charge, ultimately sentenced to 5 years. Nicholas Rodean was charged with misdemeanors on 01/29/21 and then indicted on March 19, 2021, with § 1512 and felony destruction of property charges. Mark Sahady was charged with misdemeanors until rejecting a plea; then his misdemeanors were superseded with a § 1512 charge. Grayson Sherrill was charged with 4 standard misdemeanors on 04/06/21 which were then superseded on 12/15/21 with several felonies. Hatchet Speed was charged with 4 standard misdemeanors, then hit with a § 1512 charge after rejecting a petty misdemeanor plea offer. Christopher Spencer was charged with 4 standard misdemeanors on 02/23/21 which were superseded with a § 1512 charge on 03/10/21. Yvonne St. Cyr was charged with two misdemeanors on Feb. 12, 2021, offered a probation plea deal and hit with two felony § 231 charges in May 2022 upon rejecting an offer. St. Cyr was convicted on all counts by jury in March of 2023 and sentenced to 30 months in prison. John Strand was charged with two misdemeanors and then with additional § 1512 counts. He was offered a misdemeanor "entering and remaining" deal but rejected it. (Codefendant Simone Gold accepted and got 60 days.) Strand got 32 months in prison. John George Todd III was charged with the four misdemeanors for two years and then, just nine days before trial after rejecting a plea offer, was charged with a 20-year felony, 18 U.S.C. § 111(b) assault causing bodily injury (officer cut his own finger inside the Capitol while tugging at Todd's tiny fiberglass flagpole). Later, prosecutors added a § 1512 obstruction charge after Todd asserted privilege to testify before the grand jury. Todd was ultimately sentenced to a 5-year prison term. Anthony Robert Williams was charged on 3/24/21 with 4 misdemeanors; then superseded on 5/26/21 with § 1512 and ultimately sentenced to 5 years' imprisonment. After Fischer nullified Williams' conviction, DOJ vindictively superseded again with a felony § 231 charge on 12/18/24. There are also a handful (e.g., Nicholas DeCarlo, Nicholas Ochs, Robbie Norwood, and Williams (above)) who briefly overturned their felony convictions (due to the Supreme Court's Fischer decision) and then were poised for release or retrials on misdemeanors—only to be charged with other superseding felony charges. This list is substantially larger than the number of J6ers who were allowed to have misdemeanor trials (reported to be around 23). See Michael Kunzelman, "To plead or not to plead? That is the question for hundreds of Capitol riot defendants," AP News, Jan. 5, 2024, https://apnews.com/article/capitol-riot-anniversary-sentencing-data-c0a60a2ba68a70645bd5f9e5bcc45324 (accessed 10/25/2025).

***Garland's DOJ Weaponized the Use of Vindictive Superseding Indictments To Punish J6ers Who Insisted on Their Constitutional Rights.***

156. The vast majority of J6ers were initially prosecuted for misdemeanors. However, there were only 23 misdemeanor J6 trials. This is because (1) the vast majority (over 66%) of J6ers who insisted on misdemeanor trials were denied such trials. Rather, they were charged with bogus superseding felonies, and (2) other J6ers, aware of the DOJ's insidious practice, falsely pled guilty to crimes they did not commit in order to save their lives and careers.

157. J6 criminal defense lawyers frequently reported that their J6 clients were offered "petty" misdemeanor offers, meaning the J6ers were invited to plead guilty to offenses punishable by under 6 months' jail time. However, when the J6ers rejected such offers, as a matter of course, they were punished with 20-year-felony charges.[37]

158. No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered anything near a 40-to-1 ratio of vindictive charge escalation.[38] Even twice is abusive, let alone 40 times!

[37]See, e.g., Josh Gerstein & Kyle Cheney, "Two federal prosecutors were placed on leave hours after describing Jan. 6 as an attack by 'a mob of rioters.'" Politico, Oct. 30, 2025, https://www.politico.com/news/2025/10/30/sentencing-memo-january-6-attack-00631013 (accessed 11/21/2025) (saying "defense attorney Carmen Hernandez said Taranto was only facing charges over the 2023 incident because he turned down an offer last year to plead guilty to misdemeanor charges related to the J6 riot."). See also the September 2024 interview of Brian Korte on the Brian Lupo show "Inside J6 w/J6er Brian Korte," Inside J6 with Brian Lupo, Sept. 18, 2024, https://rumble.com/v5fgsfp-inside-j6-w-j6er-brian-korte.html (accessed 11/24/2025) (saying J6er Brian Korte pleaded guilty to four charges after being threatened with prosecution under § 1512).

[38]Compare North Carolina v. Pearce, 395 U.S. 711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). Blackledge v. Perry, 417 U.S. 21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5–7 years for felony assault with a deadly weapon with intent to kill (over the same facts), after appealing). Bordenkircher v. Hayes, 434 U.S. 357 (1978) (defendant rejected 5-year plea offer and was then indicted as a career offender and sentenced to life imprisonment); United States v. Goodwin, 457 U.S. 368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting federal officer (up to 8 years), upon rejection of the offer).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***A Machine for Generating Guilty Pleas***

159. Above all, the government's practice of steep charge escalation was a machine for generating guilty pleas, including false guilty pleas. It wasn't long before J6ers began to pronounce that they were being railroaded into pleading guilty to crimes they did not commit, being forced to submit to avoid the threatened lengthy prison sentences.

***Misuse Of 18 U.S.C. § 231 and Brady Violations To Conceal Economic Prosperity Brought by J6ers***

160. Prosecutors also maliciously misused the federal rioting statute, 18 U.S.C. § 231, which criminalizes resistance to authorities during "civil disorders" which "affect commerce." Congress obviously contemplated that the statute would apply to typical riots with property damage, looting and arson in mind. Yet in J6 prosecutions, Garland's Justice Department concealed and withheld evidence that J6ers had boosted the local D.C. economy, bringing profitability to the city's hotel and restaurant industries which hadn't been seen for months before and afterward.

***A Systematic Program of Vindictive Prosecution***

161. Under conspirators Garland and Graves, vindictive prosecution became a science. There were 23 misdemeanor J6 trials. However, at least 35 accused J6er misdemeanants who demanded trials were punished with felony charges instead. This means that at least 66% were denied their constitutional right to trials.

***The Biggest Mass Brady Violation in Legal History***

162. Although prosecutors are under constitutional obligations to disclose exculpatory evidence, conspirators Garland, Graves, and their underling prosecutors knowingly withheld the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

most basic exculpatory evidence from accused J6ers, including evidence that refuted central features of their false allegations, including:

a. Evidence that the DOJ had been carefully planning the J6 event since at least August 2020[39] and had planted hundreds of undercover government operatives and agents amidst the crowds on January 6, 2021.[40] The United States concealed the information for years. Then FBI Director Wray, in furtherance of the conspiracy to take over America, lied and lectured congressmen for accusing the FBI of planting informants or agents inside the massive crowd of Trump supporters on January 6, 2021. In a bold statement that directly contradicts multiple official sources, FBI Director Christopher Wray falsely testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6th. Those lies were finally revealed in September 2025 when facts showed there were 274 undercover FBI at the scene, after hundreds of J6ers had been misled into falsely pleading guilty to crimes they did not commit.

b. Evidence showing the United States' claims of "140 officer injuries" were bogus and exaggerated, and that the most serious injury suffered by any officer on J6 was a broken finger.

[39]See John Solomon and Steven Richards, "FBI Secretly Prepared for Disputed Election and Political Violence in 2020, Bombshell J6 Memos Show," Just the News, Feb. 9, 2026 (saying the FBI conducted a tabletop exercise in summer 2020 that led to development of strategies like undercover informants and mass prosecutions for minor crimes that it would later use with the Jan. 6 Capitol riot).

[40]Documents were declassified on September 25, 2025, which revealed that there were some 274 undercover plainclothes FBI agents among the crowds on January 6. This withheld evidence led criminal defendants (and defense attorneys) to falsely plead guilty or counsel J6ers to falsely plead guilty. In furtherance of their conspiracy to rig the 2020 Presidential Election and to take over the government of the United States, former FBI Director WRAY lied and concealed this information for years and lectured House Republicans for accusing the FBI of planting informants/operatives/agents inside the massive crowd of Trump supporters on January 6, 2021. In a bold statement that directly contradicted multiple official sources, FBI Director Christopher Wray testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

c. Evidence from pre-event and post-event meetings acknowledging exculpatory and material facts (including wrongdoing and excessive force by police which stoked J6 violence).

d. Evidence of the presence of hundreds of armed, filming, recording, plainclothes agents on J6.[41]

e. Evidence from a team of undercover Capitol P.D. officers positioned above the west front lines, filming the action below. These officers would go into the Capitol, and at the end of the day they filmed curfew arrests. However, the government has not produced everything they recorded.

f. Evidence of officers committing police brutality against J6ers on a massive scale, which would have altered the United States' public J6 narratives.[42]

g. Evidence of the presence of large numbers of Antifa and Black Lives Matter rioters who instigated aggressive and offensive conduct for which innocent Trump-supporting J6ers were accused.

---

[41] As it turns out, hundreds of plainclothes FBI agents filmed J6 events and recorded their and others' expressions, excited utterances and present-sense impressions which would have been exculpatory for many J6ers. Upon information and belief, these withheld recordings would have likely shown that the Capitol grounds were not as restricted as government trial testimony had claimed. Yet these many recordings were hidden and withheld from J6 defense counsel.

[42] One notorious example involves footage of officers kidney-punching a J6er over a dozen times as the J6er cried in anguish. The officer hurt his hand. The full footage was initially posted on http://Evidence.com. Then on Christmas Night, Dec. 25, 2021, at 9 p.m., the footage was removed, and an edited version replaced it. The video abruptly ended before the beating. The notes by the investigator stated unambiguously that "The BWC was rattled, causing the Body Worn Camera to be shut off." Then, a NEW video popped up, where the beating had ended, but the BodyCam footage resumed. See also https://x.com/FreeStateWill/status/1693613732633460866 (accessed 6/3/2026) (showing the second gap in McAllister's footage occurred in the tunnel as he and Lt. Bagshaw were beating the defenseless Victoria White in the head. For both gaps, McAllister's camera did not beep (as normal) when the recording resumed less than a minute later (thus showing the footage was likely edited by prosecutors after obtaining the video from officers)).

h. Text messages and other communications by U.S. Secret Service about the events of January 6th, including "pipe bomb" claims, the movements of Trump, Pence, and Harris, and the falsity of restricted areas at the Capitol.

163. The nondisclosed evidence that J6 prosecutions had been staged, set up, and planned in wargaming and tabletop exercises months in advance was also concealment that the J6 prosecutions were a conspiracy, administratively planned in advance, rather than legitimate acts of court advocacy in response to crimes. Not only did this withheld evidence keep J6ers from proving entrapment, but the evidence showed planning to entrap J6ers, in advance, by the United States and its officers.

164. As a consequence of the United States' withholding this exculpatory evidence, many defense lawyers counseled J6ers to falsely plead guilty. Those J6ers who went to trial, including some of the Plaintiffs, were wrongly convicted of crimes they did not commit.

***DOJ's Pattern of Vindictive Escalation of Charges and Penalties For the Plaintiffs Who Tried to Defend Themselves***

165. As described above, some of the Plaintiffs were initially charged with just misdemeanors. However, when they rejected petty-misdemeanor (i.e., up to 6 months' imprisonment) plea offers and exercised their right to trials, the Garland Justice Department punished them with felonies in retaliation and without probable cause. In most cases, the Garland Justice Department charged alleged misdemeanants with 20-year felonies. This 40-to-1 ratio was the most extreme ratio of escalation ever registered in any case in the history of federal courts.[43]

---

[43]No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered a 40-to-1 ratio of vindictive charge escalation. Compare North Carolina v. Pearce, 395 U.S. 711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). Blackledge v. Perry, 417 U.S. 21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5–7 years for felony



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

166. Almost all J6ers who demanded trials received prison sentences. In fact, the majority of J6ers who were initially charged with misdemeanors found themselves facing additional felony charges when they exercised their constitutional right to trials. This occurred amongst a jury pool composed of more than 90% Democratic voters where the jury conviction rate for J6ers was 100 percent. Prison sentences for J6ers who demanded trials on felonies averaged two years longer than sentences of J6er felons who pled guilty.

167. This landscape of steep charge escalation and punishment led many J6ers to denounce the prosecutions and publicly proclaim they were wrongly convicted. In response, the DOJ threatened further retaliation against them.

168. Judges such as Chief Judge Beryl Howell explicitly agreed with the government's retaliatory charging of J6ers who turned down plea offers. Chief Judge Howell even excoriated a federal prosecutor who failed to add felony charges against a J6er who insisted on a misdemeanor trial.[44]

***The Government Turned J6 Sentencing Hearings Into Pageants of Exaggeration, Fabrication, and Blood Lust***

169. The Government demanded seizure of every penny crowdfunded for legal defense as punitive fines. J6ers had difficulty finding public defenders who would zealously defend them. Moreover, in every case where J6ers sought to raise funds for their defense, the

assault with a deadly weapon with intent to kill (over the same facts), after appealing). Bordenkircher v. Hayes, 434 U.S. 357 (1978) (defendant rejected 5-year plea offer and was then indicted as a career offender and sentenced to life imprisonment); United States v. Goodwin, 457 U.S. 368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting federal officer (up to 8 years), upon rejection of the offer).

[44] In the case of United States v. Todd, Chief Judge Howell scolded a prosecutor for making her have a trial on misdemeanors. When the federal prosecutor responded that the DOJ had searched for felony charges to bring against Mr. Todd, Chief Judge Howell warned the prosecutor that he was "running out of time."



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

prosecutors demanded that every penny raised for legal defense be seized and turned over to the government.

**The DOJ Monitored Social Media, Seeking to Silence and Punish Attempts by the Plaintiffs and Their Attorneys To Alert the Public Regarding These Injustices.**

170. Under the Constitution, an accused has a First Amendment, Fifth Amendment (due process), and Sixth Amendment (fair trial/counsel/defense/confrontation) right to alert the public regarding injustices in the federal courts. Accused persons also have a constitutional right to plead for help in defense. The public also has First and Sixth Amendment rights to be informed of injustices and to donate funds to fight injustice. However, Garland's Department of Justice scoured through J6ers' social media posts to identify memes, statements, podcasts, or interviews by each J6er regarding the prosecutions. Prosecutors filed pleadings to punish those J6ers who tried to alert the public regarding their treatment. Federal prosecutors even filed documents to sanction criminal defense lawyers who alerted the public about the unjust prosecutions.

171. The rigging of the 2020 Presidential Election which was followed by DOJ prosecutors imprisoning J6ers and attempting to keep the wrongful arrests, fines, and imprisonment secret from the public was in furtherance of the true insurrection which had rigged the election.

***Fabricated Sentencing Enhancements to Increase J6er Sentences***

172. In almost every trial where any J6er testified in his own defense (often because the J6er was forced to, because the DOJ systematically intimidated defense witnesses or precluded J6ers from presenting defense arguments unless the J6ers took the witness stand), the Government claimed the J6er lied during the testimony—invariably pointing at some subjective question—and then demanded a two-point sentencing enhancement for 'committing perjury.'



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***Property Returned Damaged, Broken and Missing.***

173. Upon their release from the malicious charges, the Plaintiffs sought the return of property which had been seized by the FBI during their cases. The FBI returned their property damaged, missing and/or broken. The FBI returned cell phones and computers to J6ers with hard drives and files destroyed or missing.

174. The hard drives and SIM cards were missing probably because the Government withheld, hid, or destroyed them. Those drives and SIM cards contained images and videos taken on January 6th which refuted and debunked the Government's bogus narratives. Thus, these acts of damage and theft constituted Brady violations as well as takings and/or negligence.

175. All of these items were fully functional and in good condition prior to the FBI's seizures.

***The AUSA Prosecutors Who Were Part of the Conspiracy To Commit and Cover Up the Insurrection and Treason***

176. The following are some of the prosecutors who conspired to act beyond the bounds of the law to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Merrick Garland, the U.S. Attorney General who supervised, guided and directed the grave national injustice herein described.

b. Matthew Graves (U.S. Attorney for D.C.), who implemented and imposed these abuses in the District of Columbia.

c. Greg Rosen, Chief of the Capitol Siege Section who oversaw the Capitol Siege Section, supervising hundreds of abusive prosecutors and J6 investigations. He supervised more than 1,000 prosecutions, trained and managed over 200 prosecutors and



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

staff, and coordinated the abusive investigation and litigation from grand juries through trials and appeals.

d. Jeffrey Nestler, an Associate Deputy Attorney General at the U.S. Department of Justice, used blatant perjury in his rigged J6 trial of Oath Keepers. Mr. Nestler also concealed and withheld the evidence that would have exposed government perjury during the trial.[45]

e. Jocelyn Ballantine supervised numerous abusive and malicious J6 prosecutions. Ms. Ballantine and Assistant U.S. Attorney Jason McCullough approached Proud Boy leader Enrique Tarrio with a cooperation deal around October 2022 in which the government promised Mr. Tarrio's immediate release if Tarrio would falsely say that Donald Trump had directed the Proud Boys on J6. Ms. Ballantine is presently pursuing wrongful prosecution against an innocent black man to cover up the role of the government in the government's "pipe bomb" affair.

f. Brendan Ballou, an Assistant U.S. Attorney (AUSA) who prosecuted several J6ers with sadistic zeal. Mr. Ballou fought for jury instructions that said there were no First Amendment rights at the U.S. Capitol.

g. Ashley Akers prosecuted dozens of January 6th defendants, with a focus on exaggerated claims of "assault" on law enforcement officers. She perfected the art of vindictively prosecuting accused misdemeanants with felonies when they demanded trials.

[45] Blaze Media's October 2023 investigation found that witness David Lazarus's trial testimony was contradicted by extensive Capitol CCTV footage. Although Lazarus claimed to witness a hostile encounter between Officer Dunn and Oath Keepers, analysis showed Lazarus was in a Senate office building when the encounter began and did not arrive at the scene until three and a half minutes after the last Oath Keepers had left the area. Officer Dunn's testimony also appears to have been inconsistent. Initially, he claimed Oath Keepers had de-escalated the situation, but his later accounts portrayed them as aggressors.

She presided over the Chris Quaglin investigation, where agents told a J6er he would never see his family again unless he testified against fellow J6ers.

h. Kyle M. McWaters was a leading orchestrator of escalated 20-year-felony charges against J6ers who turned down misdemeanor plea offers. Mr. McWaters refused to dismiss a false § 1512 conviction of J6er Hatchet Speed even after the Supreme Court struck down the use of the statute as a disorderly-conduct substitute. i. Michael Gordon, an AUSA who used his status to abuse J6ers. In at least one case, Mr. Gordon argued that J6ers who carried flags were committing assault with a deadly weapon because a plastic flagpole might poke someone's eye out. j. Sean Murphy, a particularly cruel prosecutor who vindictively and relentlessly prosecuted such J6ers as Stephanie Baez with a bogus § 1512 charge when Baez insisted on her right to a trial. Even after the Fischer decision, Mr. Murphy refused to drop the false charge against Baez. Ms. Baez was hospitalized from stress and suffered several miscarriages during the ordeal. Ms. Baez was finally acquitted of the vindictive bogus charge at trial. k. Sam White vindictively charged J6ers such as Derek Gunby with false "obstruction of official proceeding" charges when they wouldn't plead guilty to misdemeanors. l. Alexis Loeb, like others in the conspiracy, used her position to vindictively increase charges against J6ers who wouldn't plead guilty. As former Deputy Chief of the Capitol Siege Section, Ms. Loeb played a senior leadership role in coordinating the section's abusive and malicious prosecutions. m. Lisa Monaco, deputy Attorney General from April 2021 to January 2025, publicly framed January 6th as an "attack on our democracy." Ms. Monaco emphasized the heavy use of inapplicable felonies like 18 U.S.C. § 1512(c)(2) ("obstruction of an official proceeding") for many non-violent entrants. Under Ms. Monaco's direction, J6 prosecutions peaked before the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

2022 and 2024 elections. Ms. Monaco also tried to pressure J6er James Giannakos into falsely saying the Proud Boys had followed Donald Trump's directions on January 6th. n. Barry Disney vindictively and maliciously added two 20-year felony charges (§ 1512 and § 111(b) "assaulting an officer, causing bodily injury") against a J6er when the J6er testified before the grand jury in his defense. (The bogus "assault" charge was fabricated upon an officer's finger cut when the officer pulled on the J6er's fiberglass flagpole on J6.) o. Samantha Miller used Brady violations and false police testimony to obtain convictions against a J6er. p. Francesco Valentini stalked social media accounts of J6ers and their lawyers to punish those who criticized the unjust prosecutions.

177. These prosecutors overcharged many participants in the J6 protest and weaponized the Justice Department by holding defendants in pretrial detention, imposing lengthy delays, and denying due process and exculpatory evidence to J6ers.

***The District Court Judges Who Participated***

178. The following are some of the District Court judges who acted beyond the bounds of the law to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Judge Beryl Howell was the chief judge of the District of Columbia until mid-2023. Judge Howell worked hand in hand with federal prosecutors in the escalation of misdemeanor cases into felony cases when J6ers demanded trials. Judge Howell also aided federal prosecutors in concocting diminished rights to pre-trial release for J6ers in plain contradiction of settled appellate precedent. In fact, she inserted herself to overrule all decisions from Magistrate Judges in at least 17 different courts where Magistrate Judges followed the law to release J6ers who were charged with J6 offenses based on criteria of law which did not apply. This included cases involving, but not limited to, Tom Ballard,



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Richard Barnett, Jeffrey Scott Brown, Lisa Eisenhart, Eric Munchel, Scott Fairlamb, Doug Jensen, Cody Mattice, Timothy Hale-Cusanelli, Ronald McAbee, Brian Mock, Ethan Nordean, Christopher Quaglin, Zachary Rehl, Thomas Sibick, Jack Whitton, and Christopher Worrell. Judge Howell was the main protagonist who led the judges of the District Court of the District of Columbia, and knowingly and intentionally was intent on removing Donald J. Trump from office by concealing the rigging of the Election. Her conduct and that of the judges who follow in this section need to be examined by the Department of Justice and, if applicable, they should be prosecuted for their complicity in the conspiracy to commit treason.

b. Judge Emmet Sullivan who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

c. Judge Trevor McFadden who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

d. Judge Rudolph Contreras who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

e. Judge Reggie Walton was particularly cruel in imposing supposed "COVID"-related mask and vaccine restrictions on J6ers. Judge Walton knew that prospective jurors who disdain mask and COVID vaccine rules tended to be skeptical jurors who might also be skeptical of the bogus J6 prosecutions. So Judge Walton prohibited unvaxxed jurors in order to tilt trials in favor of the prosecution.

f. Judge Amit P. Mehta presided over numerous J6 prosecutions and ruled for the government on most pretrial and post-trial motions. Judge Mehta also pronounced that J6er motivations were lies because the 2020 election was "clearly" not stolen.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

g. Judge Royce C. Lamberth claimed that "no evidence ever emerged" supporting Donald Trump's election criticism—despite ruling repeatedly that J6ers could never present such evidence.

h. Judge Amy Berman Jackson referred to J6ers' election integrity motivations as "the lie that the [2020] election was stolen" despite repeatedly denying J6ers the opportunity to show their good faith regarding the issue. i. Judge Tanya Chutkan, who handled Trump's federal election case and many J6 sentencings, described the protest as a riot fueled by "baseless claims of a stolen election" despite Judge Chutkan's denial of every attempt to support the stolen-election claims with evidence. Because the issue of "corrupt intent" was an element required for conviction under 18 U.S.C. § 1512 obstruction, this denial of opportunity to present evidence was a fundamental due process violation. Moreover, the government's withholding of such evidence was not just a discovery violation but a Brady violation. j. Judge Timothy Kelly helped the government conceal evidence of FBI misconduct, including evidence that Agent Nicole Miller and her team destroyed evidence, unlawfully recorded attorney/client communications and sought to break up the marriage of J6er Zachary Rehl. k. Judge Thomas F. Hogan made it public that the J6ers committed an "insurrection that was probably the worst thing that's happened to our democratic way of life in our history." He continued ruthlessly with his bias.

***The Magistrate Judges Who Participated***

179. The following are some of the Magistrate Judges who conspired to act beyond the bounds of the law to bring injustice as the way of the U.S. District Court in the District of Columbia:



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

a. Magistrate Judge Moxila A. Upadhyaya processed many J6 cases while applying the tilted rules of the other judges of the District (e.g., protective orders to prevent public awareness, pretrial rulings precluding the First Amendment and entrapment defenses, evidentiary rulings allowing prosecutors to show evidence of violence throughout the Capitol while narrowing J6ers' evidence to things immediately seen). Magistrate Judge Upadhyaya presided over J6 cases despite having previously represented clients who were deposed or were major players in Dominion Voting machine litigation cases involving the 2020 presidential election.

b. In fact, it is on information and belief that she personally represented the president of Venezuela who was the one who perpetrated the scheme of rigged election equipment on the United States. She had been asked to disqualify herself, and she always refused. Judge Upadhyaya had been the personal attorney for the head of the snake selling computer election results in America. She stayed on cases knowing full well that she was deeply conflicted out and was one of the harshest and worst judges of all. She also stays as Magistrate Judge on the matter of Dominion Machines v. Byrne, and she is so totally conflicted, it leads to a conclusion that she is aware and intentionally acting wrongfully. Her position leads to a conclusion that she is acting in furtherance of the wrongful rigging of the Election, making her probably guilty of participating in a conspiracy to commit sedition, insurrection, and treason.

c. Magistrate Judge Zia M. Faruqui presided over numerous J6er arraignments. At one misdemeanor J6 trial, Magistrate Judge Faruqui instructed a jury that all of the statutes involved were constitutional and that there were no First Amendment rights at the U.S. Capitol. Judge Faruqui imposed the heaviest fine in U.S. history for a



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

misdemeanor, $103,000, upon a J6er who strode through open doors into the Capitol and walked around for under 10 minutes.

***Other Damages***

180. As a direct and proximate result of the Government's tortious conduct, each of the Plaintiffs suffered and continues to suffer losses in excess of $1 million, including but not limited to medical expenses, lost wages and income, pain and suffering, severe emotional distress, loss of liberty, reputational harm, and other consequential damages.

181. The Plaintiffs also suffered loss of consortium with their spouses. Husbands and wives abandoned them during these malicious prosecutions.

182. At least six J6ers committed suicide due to the trauma,[46] and many others attempted suicide during the ordeal.

**The Atrocities Which Occurred In Prison**

183. When J6ers were incarcerated in jails and prisons, they were subjected to additional abuse. J6ers were forced to surrender DNA samples, even if held on mere nonviolent misdemeanors. J6ers who refused to submit to experimental COVID-19 vaccine injections were denied attorney visits and held in solitary confinement for extended periods. They were also denied haircuts and shaving privileges.

184. J6ers were also denied access to their discovery to prepare for trials. In some cases, defense attorneys who came to the jails in D.C. or Alexandria to show or provide digital discovery or video files to J6ers were turned away by jail authorities multiple times. And in

[46] J6ers Mark Aungst, Christopher Stanton Georgia, Jord Meacham, David Kennedy Homol, and Matthew Perna took their own lives during the prosecutions.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

some cases, incarcerated J6ers were never allowed to see their discovery—the evidence against them—until they were in trial.

185. J6ers were denied medical care and treatment throughout the federal prison and jail system. J6ers such as Bart Shively and Christopher Worrell were denied cancer treatment, causing their cancers to grow out of control. Mr. Shively died shortly after his release from prison.

186. The FBI also monitored attorney-client communications of J6ers and used information gathered in such illicit surveillance to strengthen their prosecutions against J6ers.

**A Case In Point**

187. For purposes of explanation, one J6er has been chosen to explain what happened to innocent people on J6 and thereafter. Ryan Zink was a campaign photographer for his father, a candidate for Congress.

188. The Zinks made their way around the Capitol to the east side, following massive crowds. Shortly after 2 p.m., the Zinks heard a megaphone interaction between Capitol Police officers and protestors wherein a Capitol Policeman promised to see if he could get approval for the crowd to move forward to the steps of the building. Minutes later, the barricades were removed, and the Zinks saw exuberant crowds rush forward to the east Capitol steps. Ryan saw a police officer literally waving people forward.

189. Ryan livestreamed as he and his father joined the crowd moving forward. Ryan hyped up the drama for his livestream audience, saying into his phone, "We're storming the Capitol!" When the Zinks got to the upper east balcony, they witnessed a young man kicking at windows. Ryan loudly shouted at the crowd to let police do their jobs and arrest the man. Seeing that the Zinks were protecting them, the officers asked Ryan to help give them space and record



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the incident. Moments later, the officers abandoned the arrest of the window kicker and moved away toward the main door. The Zinks eventually followed after the officers to photograph and livestream the scene at the door. When Ryan saw violence near the Capitol entrance, he and his father quickly made their way down the steps and back to their hotel.

190. Just days later, Ryan was awakened by flash bang grenades at his home in Amarillo, Texas. A large tactical team of counterterrorism officers kicked in his door and raided his rented property. He was charged with a 20-year felony, "obstruction of an official proceeding," and two misdemeanors. Although a local magistrate judge ordered Ryan released on pre-trial conditions, prosecutors and judges in D.C. teamed against him to appeal the ruling.

191. Ryan spent the next month in various jails, poisoned with rotten food and losing forty pounds from illness and distress.

192. As Ryan prepared for trial, he noticed that the DOJ deprived him of important discovery including the photos and video he had taken with his campaign camera. The DOJ provided only his Facebook livestream images, in which Ryan had dramatized the J6 events with hyperbolic "We're storming the Capitol!" statements.

193. At trial, the officer who thanked Ryan and asked Ryan to record the event lied on the stand and said Ryan had gotten in his way on the balcony on J6. The officer who waved crowds forward to the Capitol testified that he was waving only at another officer.

194. Oddly, prosecutors provided a couple of images from Ryan's campaign camera in discovery. However, prosecutors withheld hundreds of other photographs. During trial, when Zink's attorney asked Judge Boasberg to order the prosecution to provide the seized camera footage, Judge Boasberg would not issue the order, saying Zink should have asked earlier, which



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

he had. When Zink's counsel brought a flash drive to prosecutors for prosecutors to transfer the nondisclosed camera files, he untruthfully advised that the files had been deleted.

195. Later, at closing argument, a federal prosecutor told jurors that Zink had lied on the witness stand about being a campaign photographer on J6 and even told the jury that the (missing) camera images did not substantiate Ryan's defense.

196. Upon cross-examination, government witnesses admitted that no one inside the Capitol building could have possibly heard anything Ryan Zink had said to his livestream audience on his cellphone. Jeff Zink testified that even he could not hear what Ryan was saying to his livestream audience amid the roar of the crowd. Nonetheless, Mr. Zink was convicted of "obstructing an official proceeding" of Congress for making a few hyperbolic remarks into his cell phone while outside the Capitol.

197. Prior to sentencing, the Supreme Court invalidated the use of the § 1512(c)(2) "obstruction of an official proceeding" statute as a punishment for political demonstrators. Thus, Ryan faced sentencing for only two misdemeanors by the time of sentencing. Nonetheless, prosecutors requested maximum, consecutive sentences for the misdemeanors. Chief Judge Boasberg sentenced Mr. Zink to 90 days in jail, an outrageous sentence for a first-time offender who merely livestreamed his experience outside the Capitol and helped officers on J6.

198. Ryan Zink continues to suffer long-term injuries from the ordeal, and his wife suffered several miscarriages due to emotional distress.

**<u>Specific Allegations As To Each Plaintiff</u>**

199. In each of the Plaintiffs' cases, the J6 criminal proceedings terminated in the Plaintiffs' favor, either by dismissal, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

200. The prosecutions were initiated and pursued without probable cause, with actual malice, and for the improper purpose of politically persecuting the Plaintiffs because of their support for President Donald J. Trump and their exercise of constitutional rights. The following summarizes each Plaintiff's prosecution and its termination in their favor:

**Ronald J. Cloutier**

201. The Plaintiff Ronald J. Cloutier lives in Rathdrum, Idaho, with his wife. For thirty years before these events he lived in Vienna, Virginia, about half an hour from the Capitol. He obtained a Secret clearance in 1992 and a Top Secret clearance in 2005. He had taken law-enforcement courses at a community college, had once thought of becoming an FBI agent, and regularly attended events in McLean and Vienna in support of local police.

202. Mr. Cloutier invited about ten friends to go with him on January 6, 2021; all of them backed out. He drove in by himself, met other friends at the rally, and after the President urged the crowd to walk peacefully to the Capitol, he did. On the West Terrace he saw broken glass by one entrance and refused to go near it.

203. Then Mr. Cloutier saw a Capitol Police officer in a white shirt open a door from the inside. He understood that the police were letting the crowd in, and he followed others into a long hallway. About twenty yards in, the crowd came to a stop against a line of officers blocking the hall. People were packed in like sardines, and with the crowd pressing from behind there was no way back.

204. Claustrophobic and unable to retreat, Mr. Cloutier put his hands flat against his own chest and moved toward the only open space, beside the officers. He was sprayed in the face with a chemical agent. He could not see and could hardly breathe. He was tripped or pushed and fell to the floor. A stranger led him back out through the door he had come in. He sat outside



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

for about half an hour while people brought water to flush his eyes until his sight returned. His memory of the weeks that followed is still clouded. At no point that day did anyone tell him he was not permitted to be there, and he saw no sign saying so.

205. When the government announced that it would pursue everyone who had gone to the Capitol, Mr. Cloutier concluded he would probably be arrested and possibly imprisoned for years. He did not want his wife left alone in Virginia without family. The couple sold both of their properties—giving up low-interest mortgages, paying a heavy tax penalty, and losing the appreciation those properties have since gained—and moved across the country to Idaho to be near his brother.

206. The move cost Mr. Cloutier his job and the security clearance he had held for thirty-two years. He now works at a job that pays much less and has no benefits.

207. The FBI identified Mr. Cloutier's cell phone using the biggest general warrant in U.S. history, a geofence warrant that captured every cell phone at the Capitol without specific probable cause. An FBI agent came to Mr. Cloutier's door in 2022. Mr. Cloutier told him he would like to talk but no longer trusted the Bureau. The government waited more than a year, and then, on May 31, 2024, obtained a warrant for his arrest. He was arrested and appeared in federal court in Coeur d'Alene on June 3, 2024, in United States v. Cloutier, No. 1:24-mj-00159 (D.D.C.). He was handcuffed and made to give a DNA sample under threat of being jailed if he refused. He was placed on pretrial conditions that restricted his travel and subjected him to drug testing.

208. Mr. Cloutier was charged with entering and remaining in a restricted building or grounds. The proceedings ended when the government dismissed the case.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

209. For years Mr. Cloutier woke every morning wondering whether that would be the day they came for him. The case cost him nearly every friend he had made in thirty years in Northern Virginia and some members of his own family.

210. Mr. Cloutier's prosecution terminated in his favor with the pardon of January 20, 2025. The DNA sample taken from him under threat of detention remains in the government's possession.

**Phillip M. Crawford, Jr.**

211. The Plaintiff Phillip M. Crawford, Jr., lives in Bremen, Georgia, with his wife, Stephany, and their three children. He worked twelve years in the crane industry and then built his own medical-supply business, which he ran for six years and which brought in about $50,000 a month. He had never been in trouble with the law. When the government came for him, he had sold his home and was building an $800,000 house for his family.

212. On January 6, 2021, Mr. Crawford, wearing a "Stop the Steal" shirt, was near the Lower West Terrace tunnel. Standing on a handrail about five feet above the crowd, he watched officers beat Victoria White with batons and fists, and he heard a man in the crowd cry out twice, "Please don't beat her." He dropped down and pushed toward the front of the crowd to try to reach her. He got within about three feet.

213. Officers struck Mr. Crawford in the head with metal batons, by his count forty-two times. He was blinded by chemical spray, and his knee was injured. Unable to see, he pulled off his gas mask and threw it down. A stranger put his hands on the rail, and a woman took him by the shoulders, walked him down the steps, sat him down, and got people to bring him water for his eyes. He also tried to help Rosanne Boyland during the crush, something he still cannot talk about without breaking down.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

214. On March 4, 2021, FBI agents came to Mr. Crawford's door and asked him whether he had been at the Capitol and whether he had hit anyone with any object. He told them he had been there, raised his hands, and said these were the only things he had. The agents said they had nothing else to ask and left.

215. More than two years later, at 5:30 in the morning on July 12, 2023, some forty to fifty Marshals and FBI agents raided his parents' home in Douglasville, Georgia, where he was living while his house was being built, and held his family at gunpoint. The standoff the government described lasted forty-five minutes because he was saying goodbye to his children. A judge had signed an order imposing house arrest and an ankle monitor on July 11—the day before he was arrested, before he had any hearing on release.

216. Mr. Crawford was made to give up his firearms and was placed on strict house arrest for five months and wore an ankle monitor for about seventeen months. He spent much of that time in his parents' basement. He traveled to Washington three times at his own expense, each time saying goodbye to his children without knowing whether he would come home.

217. The superseding indictment filed on March 6, 2024, charged Mr. Crawford with eleven counts, including civil disorder, assaulting officers, restricted-area offenses, disorderly conduct in a Capitol building, and physical violence in the Capitol grounds or buildings. Count VI alleged assaulting an officer with a dangerous weapon—the gas mask. He called about a hundred lawyers; the only one willing to take a January 6th case wanted $500,000 to begin. He was left with public defenders who called no witnesses, did not contact Victoria White—he had to reach her himself—and gave him the discovery videos only on the day he pleaded.

218. Mr. Crawford refused to sign a Statement of Offense stating that he had struck officers on purpose or that the officers had acted lawfully, and the Statement of Offense went



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

through four drafts before those words came out. At the plea hearing the signed Statement of Offense could not be found, and a new copy was printed for him to sign on the spot; Mr. Crawford, who has attention-deficit disorder, could not read it quickly. Two days later he discovered that the language he had refused had been put back in. He pleaded guilty to six counts on May 17, 2024, and went to a bench trial before Chief Judge James E. Boasberg on the five remaining counts on June 17–18, 2024. The court acquitted him of the dangerous-weapon elements of Counts VI through IX, allowed the lesser-included charges to proceed, and found him guilty of Counts VII through X. It held the verdict on Count VI in abeyance pending briefing. In an August 27, 2024, opinion, the court stated that it would find him guilty on Count VI when it delivered that verdict at sentencing. Mr. Crawford says he asked to withdraw his plea after the trial. His public defenders withdrew from the case.

219. Mr. Crawford was never sentenced. He was facing a sentencing on February 10, 2025, at which he was told he could receive fifteen to eighteen years, when the President's pardon came.

220. The prosecution destroyed Mr. Crawford's livelihood. His business went from about $50,000 a month to nothing. He sold about a hundred firearms, his trailers, a skid-steer, a camper, and five acres of land; both of his vehicles were repossessed; he made an early withdrawal from his 401(k) and used his savings; he defaulted on a Small Business Administration loan and on his credit cards; and friends paid his $3,400 monthly house note so his family could keep a roof over their heads. His credit, once perfect, was ruined.

221. After the pardon, a friend who manages a branch of his old crane company hired him. A year later, corporate human resources let him go because of January 6th.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

222. Mr. Crawford's prosecution terminated in his favor, before any sentence was imposed, with the pardon of January 20, 2025. His DNA remains in the government's possession.

**Bruno J. Cua**

223. The Plaintiff Bruno J. Cua lives in Monticello, Georgia, with his wife. He was eighteen years old and a high-school student on January 6, 2021. He had been flying American and Trump flags from his truck since 2018, and in the fall of 2020 a video of the large flag he flew went viral; he was banned from TikTok the week before the election. He attended the November 2020 march in Washington with his family.

224. Mr. Cua went to Washington for January 6th with his parents and stayed with a cousin. On the drive around the city the day before, he was pulled over four times. On January 6th the family took a ride-share to the Ellipse, and afterward walked to the Capitol, where the fencing was already down. He climbed a tree and then scaffolding to film the size of the crowd.

225. From there Mr. Cua watched police begin spraying and firing projectiles into the crowd. An elderly woman with bleeding eyes came to his mother for help washing them out. His parents left. When Mr. Cua told an officer that the police should be on the people's side, the officer sprayed him in the face.

226. Mr. Cua went into the Capitol, where people already filled the Rotunda, and followed the crowd without knowing where it was going. He says he walked in alone and did not take part in violence. He was inside for fifteen to seventeen minutes, asked police how to get out, and left; he spent the next forty-five minutes finding his parents.

227. Mr. Cua says the assault charge arose from his standing in front of an officer who pushed him.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

228. On February 5, 2021, Mr. Cua went with his father to a local courthouse to pay a fine on a noise ticket. Four FBI agents surrounded them, would not let him speak to his father, and took him into custody without advising him of his rights. He was put in solitary confinement over the weekend and denied meals. His bond hearing was delayed, he was moved to another jail, and the hearing was delayed again.

229. While he was in custody, agents raided his parents' home. They broke down the family's one-of-a-kind front door after walking past six unlocked glass doors, broke the front gate, which could have been opened by hand, destroyed the water filter in the basement, and overturned the entire house. They left with a hat and a hoodie. At the police station they searched his truck and left the lights on until the battery died; the family had to have it towed home and repaired.

230. The court then denied Mr. Cua bond on the theory that his own parents had aided and abetted him. He was sent back to jail, denied commissary, and denied even a book for three weeks. He was moved on the Marshals' airlift, and his legal papers were thrown away. Other inmates kept him from the telephones and computers, and after being told he had tested positive for COVID he was put back in isolation. Of the forty days he spent in custody before trial, thirty-two were in solitary confinement. He was punched in the eye in jail.

231. When he was finally released, it was to two and a half years of house arrest, fourteen months of it on an ankle monitor, with his rights restored only slowly.

232. Mr. Cua was indicted on twelve counts in United States v. Cua, No. 1:21-cr-00107-RDM (D.D.C.), including obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2). In February 2023, after a stipulated bench trial before Judge Randolph D. Moss, he was found guilty of obstruction of an official proceeding and of assaulting, resisting, or impeding officers. His sentencing was moved a month after his family and friends had already



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

made plans to attend. On July 26, 2023, the court sentenced him to twelve months and one day in prison and thirty-six months of supervised release. The prosecution asked that he be taken into custody on the spot; the court declined.

233. The Supreme Court later narrowed the scope of § 1512(c)(2), but by then Mr. Cua had already been sentenced and sent to prison on that count. At USP Atlanta, he says another inmate choked him while he was assigned to the prison's maintenance crew. Staff turned his now-wife away from a Christmas visit and cut off visitation. He was released from USP Atlanta to a halfway house on April 3, 2024, and transferred to home detention on April 16, 2024.

234. Mr. Cua and his family suffered substantial financial losses. Coverage of his case put his family members out of work and under severe financial and emotional strain, and he and his wife were placed on the watch list.

235. Mr. Cua's prosecution terminated in his favor with the pardon of January 20, 2025. The government's agents destroyed his parents' front door, front gate and basement water filter, ransacked their house, and ran down the battery of his truck, costing thousands of dollars in damage. His DNA remains in the government's possession.

**<u>Frank D. Dahlquist</u>**

236. The Plaintiff Frank D. Dahlquist lives in Helena, Montana, with his wife and their three young daughters. When he was arrested he was in his nineteenth year in the fire service and was the paid fire chief of the largest volunteer fire district in Montana, covering about 20,000 people and 1,100 square miles. He was the state's point of contact for Montana Mutual Aid, had testified before the state legislature, and had received an exemplary review before his arrest. Before that he had been one of the most highly certified firefighters and fire officers in his Washington

department, led wildland strike teams in three states, and taught for ten years as a senior instructor at the Washington State Patrol Fire Academy. He had never been arrested.

237. On January 6, 2021, Mr. Dahlquist, his wife and his three daughters walked to the West Terrace believing it was the site of the next permitted event. There were no signs, barriers or officers telling them otherwise. Standing well back from the front, the family was hit without warning with flash-bangs, tear gas and chemical spray fired into the crowd. His wife and children were terrified. He got them out.

238. Mr. Dahlquist, a trained first responder, went back to try to calm things down. He watched an officer shove an older woman down a set of stairs three times, the last time with a baton so hard that she flew through the air. When the crowd surged, about ten people fell. Rather than land on them, he leapt into the gap between the people on the ground and a line of officers striking them with batons and spraying them from large canisters, with his hands up and his phone recording. An officer on a higher level sprayed down into the space, hitting both Mr. Dahlquist and the officers in front of him. He left the area immediately.

239. For the rest of the afternoon Mr. Dahlquist can be seen with his hands up trying to calm both sides. He told people it was a setup and urged them not to try to enter the building. He helped protect a police officer's motorcycle and carried crates of scaffolding parts and lumber away from the crowd, handing them to a line of officers who were piling them up. The government later claimed that a photograph of him tossing a board onto that pile showed him throwing it at officers.

240. At about 3:06 p.m., Mr. Dahlquist saw officers inside the upper West Terrace doors greeting people coming in, with smiles and fist-bumps on both sides. On the Capitol's own video he raises his hand in an "OK" gesture, asking the officers if it was all right to come



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

in. He had not seen an open restroom in almost eight hours; he asked the officers where one was. They pointed him down the hall, and he found it. He left at about 3:24 p.m.

241. Outside, walking backward as officers cleared the terrace, Mr. Dahlquist tripped on a step and fell on his back. An officer stood over him with a baton raised and swung it down at his head like a bat. His forearm, raised to protect his head, took the blow, leaving a large contusion; he thought the arm was broken. A stranger pulled him out from under the officer, and he went to find his family.

242. The government identified Mr. Dahlquist by facial recognition technology and an unconstitutional geofence warrant, which captured Mr. Dahlquist's phone device without individualized probable cause. It obtained information from Apple, Google and Verizon accounts belonging not only to him but to his wife and his three young daughters; no warrant for those accounts was ever disclosed. The case against him was built on screen captures supplied through the private group that calls itself Sedition Hunters—no original photographs and no metadata—including an image of him that was plainly altered. On August 18, 2022, FBI agents entered him in a terrorist-member database used in background checks.

243. On August 22, 2022, FBI agents arranged through a real-estate agent to tour Mr. Dahlquist's home in Monroe, Washington, which was then for sale while his family lived in it, and used the "tour" to search the house, opening closed closets, without a warrant. Agents trespassed on the wooded land behind the house to surveil it. The next day they went to his former supervisors at the fire department and meddled with Mr. Dahlquist's employment. After he moved to Montana, agents mounted a surveillance camera on a power pole aimed at Mr. Dahlquist's driveway—apparently without warrant.

244. On January 10, 2024—six days after the Justice Department announced it would step up arrests before the statute of limitations ran—agents arrested Mr. Dahlquist in uniform at his fire station while he was the only person on duty for the entire district. They handcuffed and shackled him and left the community without its chief firefighter. A federal judge in Great Falls ordered Mr. Dahlquist to give a DNA sample. He was told he would be released that afternoon, but was held seven days, four of them in solitary confinement because, he was told, he was a "high profile case." He was released to home detention, with monthly drug and alcohol tests and unannounced searches of his home.

245. The media and online activists had Mr. Dahlquist's name before his case was even unsealed. His wife and his assistant chiefs began receiving harassing and threatening calls, messages and letters. He was forced to resign as fire chief. He gave up the telephone number he had had since 1997.

246. For approximately nine months the government kept him under a criminal complaint and told his lawyers he had no right to discovery until he was indicted, while pressing Mr. Dahlquist to plead guilty and threatening to add more and more serious charges if he did not. None of the officers named in the complaint had ever written a report about the incident; one was not sure it was him in the photograph and another did not remember it; and in the full body-camera footage an officer can be heard saying they had been sprayed by their own people. When Mr. Dahlquist would not plead, the government indicted him in October 2024 on more serious charges in United States v. Dahlquist, No. 1:24-cr-00443-BAH (D.D.C.). The court denied every defense motion and set trial for the days after the inauguration.

247. On January 22, 2025, the government moved to dismiss the case, and it was dismissed without prejudice.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

248. Mr. Dahlquist's career in the fire service is over; departments will not interview him, and his name remains tied to January 6th online. Agents entering wrong passcodes into his phone wiped the photographs and video that would have shown him trying to calm the crowd, and the phone they seized was returned unusable to a fire department where he no longer worked. His expired passport was never returned. He, his wife and his daughters have lived with sleepless nights, nightmares and fear ever since.

249. Mr. Dahlquist's prosecution terminated in his favor when it was dismissed without prejudice in January 2025. The government's agents wiped the telephone that held his photographs and video of January 6th, returned his seized telephone unusable, and never returned his passport. His DNA, taken by court order, remains in the government's possession.

**Nicholas P. Hendrix**

250. The Plaintiff Nicholas P. Hendrix lives in Gorham, Maine, with his wife, Heather, and their children. He served in the United States Army from 2006 to 2010, including two combat deployments, and held a military clearance. He is a union pipefitter whose trade takes him to job sites around the country.

251. Mr. Hendrix went to Washington alone for January 6, 2021, paying $75 for a seat on one of about fifteen tour buses that left from Massachusetts the night before. He knew no one on the bus. At the Ellipse there were flags everywhere and everyone was getting along. At about 2 p.m. he walked to the Capitol with men he had met on the bus. At the vehicle gate, five or six Capitol Police officers in the guard shack waved the group through; they walked up the steps and into the building.

252. Mr. Hendrix was inside for about ninety seconds, taking pictures and video, and then stood at the door. He was pepper-sprayed directly in the face. Outside, a group of about fifteen



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Capitol Police officers walked out of the building saying they had quit; the crowd parted to let them pass, and Mr. Hendrix, among many others, gave them fist-bumps. The government later tried to use video of those fist-bumps against him, suggesting they were "assaults." He carried nothing but energy drinks, cigarettes and food. He left on the buses well before the curfew and was home in Maine the next day.

253. On January 21, 2021, two FBI agents came to his home and told him he was not in trouble and they only had a few questions. He met them at a grocery store and answered their questions for hours. They came back on March 25, 2021, and he identified himself in the Capitol footage for them. They wanted to seize every item of clothing he had worn that day—his hat, glasses, shirt, pants, shoes and backpack; he let them photograph the items instead. Over and over, they pressed him to say that President Trump had put him up to going into the building. The agents told him they worked major-crime and organized-crime cases out of Boston and that his was their first January 6th case.

254. In late May 2021, Mr. Hendrix was told to surrender at the FBI office in Portland, Maine, by the next day or Marshals would come for him. He surrendered with his lawyer on May 27, 2021. His phone was taken; he was fingerprinted, photographed and swabbed for DNA; and he was released on conditions barring him from leaving Maine. He was charged with the four standard misdemeanors in United States v. Hendrix, No. 1:21-cr-00426-CKK (D.D.C.), and told he was facing four years in prison. He pleaded not guilty.

255. For more than a year before his guilty plea, Mr. Hendrix—who was not drinking or using anything—was drug-tested more than one hundred times, twenty-six times in a single month, often having to leave work to drive to the federal building and be searched first. A succession of six probation officers searched his house, his truck, his wife's belongings and his



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

children's rooms about once a month—on a misdemeanor charge on which he was presumed innocent.

256. The government kept the Capitol video from him. His lawyer told him that if he went to trial more charges would be added and he could not win. After four or five hearings, feeling cornered and defeated, he pleaded guilty on June 27, 2022, to a single count of parading, demonstrating, or picketing in a Capitol building. At the hearing Judge Colleen Kollar-Kotelly told him that as a veteran his conduct was a disgrace. The court said that his ninety seconds inside were a "red herring" and that it was more concerned with what it had seen on a video of his conduct outside; when he asked to see that video, it was not given to him.

257. The government asked for fourteen days in jail. The court imposed thirty, followed by thirty-six months of probation and $500 in restitution—prison and probation for a single petty offense, a combination the court was told at sentencing might be unlawful and that the D.C. Circuit later held unlawful. Mr. Hendrix surrendered at the Federal Medical Center in Devens, Massachusetts, in February 2023. He spent about fifteen of his thirty days in solitary confinement, in a cell with black mold, shackled hand and foot whenever he was moved, and for the first two weeks he could not call or write to his wife. He was swabbed for DNA a second time, though his judgment did not require it.

258. After he came home, Mr. Hendrix remained on probation. He had to obtain the court's permission to travel, carry the paperwork with him, and explain his situation to every police officer who stopped him. He and his wife were placed on the SSSS list and pulled into secondary screening at the airport.

259. While he was preparing to go to prison, Mr. Hendrix posted a fundraiser on Facebook to feed his family while he was away. Facebook took it down, then took it down again,



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

and then banned him for life from Facebook, Instagram and Messenger, taking with it years of photographs of his children. He was also barred from ride-share, delivery and home-rental platforms.

260. After January 6th, Mr. Hendrix was refused entry to the nuclear power plants where pipefitters earn the highest wages, and he has had to take lower-paying work. Every background check still reports "violent entry into the Capitol," even after the pardon. On February 26, 2026, crossing into Canada for his birthday while working in Buffalo, he was taken to secondary inspection, strip-searched, fingerprinted and held about nine hours while his truck was searched three or four times; Canadian officers had a stack of paper about him and told him he was barred from Canada for life because of his January 6th record. He retains the Canadian border records, which direct him to return to the United States pending an admissibility hearing on a date to be determined.

261. Reporters came to his house after his arrest and every time he went to court, and his name remains attached online to the "Capitol riot." The family's monthly home searches, the years of scrutiny and the loss of income have taken a lasting toll on his wife and children.

262. Mr. Hendrix's prosecution terminated in his favor with the pardon of January 20, 2025. His DNA, taken twice, remains in the government's possession.

**<u>Joshua D. Knowles</u>**

263. The Plaintiff Joshua D. Knowles lives in Gilbert, Arizona, with his wife and their blended family of children. He owns and operates a service business, built over about ten years of relationships with his customers.

264. Mr. Knowles traveled to Washington with his mother on a first-ever mother-and-son trip, planned about a week in advance, to see the monuments and attend the President's rally.

They left their hotel at 5 or 6 a.m. in the freezing cold and stayed for the entire speech near the front of the stage. When his younger brother phoned to say that things were "crazy" and someone had been killed, Mr. Knowles told him he must be mistaken—it felt like a festival of love and patriotism. He and his mother stopped at a food truck, and he walked her back to their hotel before returning alone.

265. At the Senate Wing entrance, Mr. Knowles recalls that the area was calm. Officers were directing people where they could go. Mr. Knowles walked through a door that officers were holding open, and the officers told the people coming in they could come in but should go one way and not another; everyone complied. He went into a small circular room with sculptures, stayed about seven minutes because it was hot and crowded, and walked out.

266. Outside, Mr. Knowles and another man shouted at people who were trying to break windows to stop damaging property. At about 5:30 p.m., as police pushed the crowd, he found himself on the far side of a short fence with nowhere to go. A female bicycle officer came up behind him and struck him on the back of the head with a baton about five times. He told her he could not move because no one could move. When he turned and raised his flagpole to block the blows, a younger officer beside her told her to stop hitting him because he had nowhere to go, and she stopped. A news photograph of that moment later made it appear that he was rallying the crowd. He was also pepper-sprayed.

267. That evening, after the curfew, Mr. Knowles went back to look for other demonstrators. Officers from several agencies directed him toward the Reflecting Pool, and one opened a gate to let him through. There he spent fifteen minutes charging the dead phones of a woman and her teenage daughter who could not find their hotel, got them a ride, and walked them to it. Minutes later about a hundred officers encircled everyone who had not run—roughly fifty



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

people, including elderly couples and a homeless man on his mattress—and arrested them for violating the curfew.

268. Mr. Knowles was bused to a police training facility and then, at 3 or 4 a.m., to a filthy cell under the courthouse, and was released through a back door at about 10 p.m. on January 7. His mother had spent the day calling everywhere and could get no information about him. Police returned the other property they had taken, but not his phone. The FBI has never returned it and never gave him a receipt. The government instead searched it and used messages to his wife to charge him.

269. The next morning his arrest photograph ran on the front page of his hometown newspaper next to a picture of the man called the "QAnon Shaman," with the claim that he was that man. News vans lined his street, reporters knocked on his neighbors' doors, and reporters followed his then-wife as she took the children to school. His brothers had to get him out of the airport past waiting camera crews. He was told the law gave him no practical remedy against the paper.

270. Customers who had known him for ten years called and fired his company because of what they saw on the news. He lost thirty to forty percent of his business almost immediately, eventually had to sell the company outright, and had to start over.

271. Of the roughly fifty people arrested with him, forty or more accepted a local plea and a $50 fine. Mr. Knowles insisted on trial and attended every hearing for about a year and a half, even though the government's discovery could not be opened. His lawyer then told him the government was abandoning the local case and indicting him federally because he wanted to go to trial. **Because he insisted on a trial, the government traded a curfew case that others had resolved for a $50 fine for a federal prosecution.**



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

272. In August 2022, Mr. Knowles was charged with four misdemeanors in United States v. Knowles, No. 1:22-cr-00297-TJK (D.D.C.). He arranged to surrender at the Gilbert police station, was taken to the federal intake facility in Florence and held about a day, swabbed for DNA, and brought to the federal courthouse in Phoenix, where the government sought to keep him in custody. He was released and pleaded not guilty. For another year and a half the government's discovery again could not be opened, until the court ordered the government to fix it in the summer of 2024.

273. Just before the last hearing, the government offered a plea to a single misdemeanor with an open sentence. His lawyer told him that if he refused, the government would drop the misdemeanors and indict him on four felonies. Mr. Knowles feared a lengthy prison sentence after learning that a Proud Boys leader had received twenty-two years. Mr. Knowles asked the court for another month or two to decide and did not get it. He also feared the government would come after his mother. At the plea hearing Judge Timothy J. Kelly could see he did not want to plead and said he was about to reject the plea; Mr. Knowles told the judge that he did not want to plead but did not want to miss twenty years of his children's lives.

274. The government asked for up to a year in jail. On July 25, 2024, the court sentenced him to seven months—**a month for each minute he had been inside**—twelve months of supervised release, and $500 in restitution.

275. For three and a half years of pretrial supervision, a revolving series of five or six officers walked through every room of his home while his children were there. He was drug-tested at random, required to urinate fully exposed with an officer inches away; when he could not, the test was counted against him. He describes it as the most degrading part of his entire experience.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

276. Mr. Knowles asked to serve his sentence near home. There is a federal prison forty-five minutes from his house; the Bureau of Prisons sent him 498 miles away to a medium-high security institution in Victorville, California, where he surrendered on September 5, 2024. He was designated a domestic terrorist. His mail was held, his calls were monitored and cut off, and family photographs sent to him never arrived. He was forced to submit to blood, tuberculosis and DNA testing under threat of the SHU. His wife was turned away from visits two or three times, once on a finding that she had "explosive material" on her hands after she pumped gas on the way, a finding that now sits in the Bureau's records under her name.

277. Mr. Knowles was released on January 20, 2025, after the pardon. When he went to prison he lost another fifteen percent of his rebuilt business; in all, the case has cost him $20,000 to $25,000 a month in revenue. He lives with post-traumatic stress, remains on the SSSS list, and is still confronted on the road by strangers.

278. Mr. Knowles's prosecution terminated in his favor with the pardon of January 20, 2025. The telephone seized from him on the night of January 6, 2021, has never been returned, and his DNA remains in the government's possession.

**Daniel F. Leyden**

279. The Plaintiff Daniel F. Leyden lives in Francesville, Indiana. At the time of these events he lived in Chicago, Illinois, with his wife, Linda, a home-care physical therapist and marathon runner, and they had raised two daughters they adopted as children from Russia. He and his identical twin brother left for Marine Corps service at seventeen, a week or two after graduating from high school. For twenty-four years he worked as an electrician for the Chicago Park District; his personnel file held commendation letters and not a single complaint.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

280. Mr. Leyden drove to Washington with his brother, the Plaintiff Joseph Patrick Leyden, and checked into a hotel on January 5, 2021. He expected to hear a speech and be back at the hotel in a few hours, and went out underdressed in a thin flannel shirt and a pair of his wife's running earmuffs; a stranger later gave him gloves. By 8:30 a.m. on January 6, 2021, he had lost his brother in the crowd, about ninety yards from the Ellipse stage. A man named Dave shared his peanut-butter-and-jelly sandwiches with him.

281. Over two or three hours a tall man later publicly identified as Ray Epps talked with Mr. Leyden about the Marine Corps. Dave pulled Mr. Leyden aside and warned him to be careful: too many people were coming up to that man, speaking in his ear, and walking away. Before the President had even taken the stage, Epps asked Mr. Leyden to walk with him to the Capitol. Mr. Leyden, freezing and with no idea where the Capitol was, agreed. Thousands followed them.

282. On the way, Epps twice told him, without smiling, "Dan, we're taking the Capitol. We're going in." Mr. Leyden asked him who "we" was and joked that his wife would not want to wire bond money from Chicago. Uneasy, he took two time-stamped photographs of Epps and two of the police line. That line consisted of four or five Capitol officers, two of them young women, with no riot gear, behind bicycle racks with minimal signage. People around the racks wore masks. A fidgety man who arrived at the racks, later identified as Ryan Samsel, asked Mr. Leyden whether he thought he could jump the "security fence"; Mr. Leyden told him they were bicycle racks, not a security fence.

283. Mr. Leyden never picked up a bicycle rack and never struck or harmed anyone. When the crowd pressed forward and the racks went over, he was six or seven people back and



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

already walking away; a stranger helped him over a low wall onto the grass, and he walked up a grassy hill toward the Capitol. He never entered the building and never confronted an officer.

284. For the next several hours Mr. Leyden stood on a low wall acting as a crossing guard for people waiting in line, told jokes to keep spirits up in the cold, and joined the crowd in the Our Father, Hail Marys and "God Bless America." When police fired tear gas and flash-bangs into a crowd that included children and elderly people, he and a young man found folding chairs and passed them over the wall so older people could sit, and he helped a man who appeared to be having a heart attack to a bench. He then walked for hours before he found his hotel. He left Washington the next morning.

285. Within weeks, social-media posts identified "the first two feds approaching the Capitol" as Ray Epps and Dan Leyden. The FBI's public request for information put Mr. Leyden on one page and his brother on another. Upon information and belief, the government obtained his Bank of America records showing his card use at the hotel. For months, agents sat on his street at 6:05 in the morning to watch him leave for work, ducking down as he passed. The government's file on Mr. Leyden and his wife ran to roughly two hundred pages and included reviews of their loans and of social-media accounts they did not have.

286. On August 23, 2022, before dawn, eight to ten government vehicles with flashing lights filled the street and alley behind the Leydens' Chicago home, and agents took over the house while Linda Leyden was home alone. Mr. Leyden was at the family's lake house in Indiana after working the Chicago Air and Water Show. An agent got on his wife's phone and told him, "We got your house surrounded. You got nowhere to run. We know you're at the lake house. We got cars en route." State police came to the lake house after he left. An agent asked Linda Leyden—a



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Biden-Harris voter—whether the dining-room table was where her husband held his meetings with white nationalists. Mr. Leyden has never had any affiliation with any such group.

287. Mr. Leyden drove himself to the FBI's Chicago headquarters. Agents called him every few minutes on the way to tell him which intersection he was at, and demanded to know what he was doing when he pulled off the highway to find a restroom. His wife and sister-in-law met him at the gate to take his car and his dog. He surrendered his phone and passcode, was taken to a basement, handcuffed to a wall and questioned, and was shown a binder of more than twenty charges. His brother was brought into his cell at the Dirksen Federal Building. The media had been told in advance; reporters met the brothers outside, and that night they were on the news as domestic terrorists.

288. The FBI notified the Chicago Park District. Park District employees were told they would be penalized if they were seen talking to Mr. Leyden and to call 9-1-1 if he appeared at any park or building—though no one ever collected his keys, alarm codes, identification or the placard that let him drive onto lakefront property. He was fired. The day after his arrest he applied for unemployment; six days later the State of Illinois denied his claim because his employer had reported that he was "presently incarcerated" and "committing fraud." Neither was true. Lawyer after lawyer hung up when he mentioned January 6th. He appealed on his own; at the hearing the Park District's head of human resources told the judge he had beaten a female National Guard officer, the judge told her to stop, and he won.

289. Mr. Leyden was charged in United States v. Leyden, No. 1:22-cr-00314-TNM (D.D.C.), with assaulting, resisting, or impeding officers with a dangerous weapon; civil disorder; entering and remaining in, disorderly conduct in, and engaging in physical violence in a restricted building or grounds with a dangerous weapon; and an act of physical violence on Capitol grounds.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

The dangerous weapon was the bicycle rack. He was told he faced twenty-nine years; then his lawyer called to say the government was adding charges and he was looking at forty: "I don't know what you did, but the government wants you." He asked for a bench trial and was told the government would not agree; he asked to have the case moved out of Washington and was told it could not be. A second lawyer wanted another $30,000 to start. Death threats came to his house. His wife asked him to end the nightmare.

290. On May 24, 2023, Mr. Leyden pleaded guilty to a single count of assaulting, resisting, or impeding officers, and the dangerous-weapon charge was dropped. At sentencing on September 6, 2023, about thirty-five family members and friends traveled to Washington for him, and the court received some seventy letters on his behalf, including from judges and police officers. The prosecution had four people wheel a thirty-pound bicycle rack into the courtroom on a cart and threatened to prove he had attacked officers with it. The Capitol Police officer did not appear. Judge Trevor N. McFadden remarked on the presence of senior Justice Department supervisors in his courtroom and on the government's overcharging of January 6th defendants. He sentenced Mr. Leyden to thirty-eight months in prison and twelve months of supervision.

291. Mr. Leyden was the first January 6th prisoner at the federal prison in Thomson, Illinois, which held about two thousand men. He was placed in a unit and a cell that marked him as a target, with a cellmate prison medical staff described as the most unstable inmate in the facility. He endured repeated twenty-four- to forty-eight-hour lockdowns and a month-long lockdown in which lights were left on around the clock, food was slid through the door slot in small bags, and some cells were below freezing. The court's paperwork wrongly recorded that he had pleaded guilty to the dangerous-weapon offense, and he was denied First Step Act credit until



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

he hired his lawyer again to fix it. He helped each of the nine January 6th prisoners who came in after him.

292. Mr. Leyden was pardoned on January 20, 2025, after about fifteen months in prison, and released at midnight. His twin brother, whom the prison had refused to let visit because they are identical, was waiting outside. Five other January 6th prisoners with no ride home were put in a van without winter clothing and dropped at a bus station in another state; prison officials refused Mr. Leyden's offer to take them with him.

293. While he was in prison, Mr. Leyden missed the birth of his first grandchild and asked that no one send him pictures because it was too painful. When he came home, his Park District job was gone. He reported lost retirement benefits and health insurance and said he had been forced to rely on a small pension. The only work he could find was building solar farms in Indiana, six days and sixty hours a week, two hours from home, trying to accumulate enough union hours to get his family's health insurance back. He came home Saturday nights, took his wife to dinner and to Mass, and drove back Sunday.

294. Linda Leyden was alone most of every week, first while her husband was in prison and then while he worked out of state. Mr. Leyden learned of Linda's confusion when he received a call that she was being taken to the hospital. In the spring of 2025 she was diagnosed with brain cancer. Mr. Leyden left his job to care for her and lived with her in the hospital and then in hospice. She died on December 29, 2025, holding his hand. He asks himself whether he would have noticed sooner if the government had not taken him away from home. Friends of hers of thirty and forty years had stopped speaking to her because of the charges against her husband.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

295. Mr. Leyden sold the house where they had lived for twenty-seven years, did not go to the closing, and moved to Indiana. The prosecution cost him approximately $50,000 in legal fees, his wages, pension and insurance, about $50,000 in banking losses, his credit and his professional standing.

296. Mr. Leyden's prosecution terminated in his favor with the pardon of January 20, 2025. His DNA remains in the government's possession.

**Joseph P. Leyden**

297. The Plaintiff Joseph P. Leyden lives in La Grange, Illinois, with his wife, Peg. He is retired. He is the brother of the Plaintiff Daniel F. Leyden. On January 6, 2021, his right knee was bone on bone—he was dragging his leg—and he has severe sleep apnea that requires a CPAP machine and a medical mouth guard.

298. At the Ellipse Mr. Leyden and some other men lifted a veteran in a wheelchair up to the fence so he could see the President. It was, he says, like a big parade with no drinking. After the speech he walked toward the Capitol. He saw that the orange netting on the grounds had already been cut, and he heard a man on a bullhorn calling, "Everybody, one step forward." Men dressed all in black with motorcycle helmets were at the front.

299. On the upper tier, a female officer was firing projectiles into the crowd, and Mr. Leyden ducked them. A woman had ended up behind the police line; an officer seized her and threw her so hard that she went flying and landed on the ground. Mr. Leyden went to her, asked whether she was all right, and helped her up, and asked the officer, "What's wrong with you?" Officers knocked him to the ground, beat him, and pepper-sprayed him. His brother later saw a photograph of him and thought his nose was bleeding; it was pepper spray.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

300. Mr. Leyden made his way to the area above the west-side tunnel, where he stood for a long time beside an elderly woman from Texas. He watched officers stand idle, turned away from the crowd, talking and texting, and then watched a commander fire a flare and more officers come out—after which the entire upper crowd was cleared in seven to eleven minutes. With his bad knee he could not move until the crowd had gone. He walked to the wrong hotel, was laughed at by a doorman for not knowing the city had been shut down for hours, and got a ride from a stranger. He went home the next day.

301. Afterward his daughter believed the family was being followed. At a funeral, two men came up to Mr. Leyden at the back of the church, showed him photographs of him and his brother on their phones, and asked whether he recognized them. His photograph was on the FBI's public request for information. In April 2021 he had his knee replaced.

302. Before dawn on August 23, 2022, agents banged on the door and threatened to break it down. Mr. Leyden was asleep in his CPAP mask, and his wife had to shout to wake him. Agents had already put black tape over the family's doorbell camera and the neighbor's. When he opened the door he was grabbed, handcuffed and held outside for the neighbors to see while police and FBI vehicles lined the street. In his words on his claim form, he was "swatted" and "held at gunpoint." His wife and daughters were separated for questioning. His youngest daughter had just been admitted to a selective program and had to be promised she would still get to school that day.

303. Agents seized his flag, a sweatshirt, flagpoles from the garage that had never left the house, and his phone, and hunted for a handkerchief he had thrown away. They saw the Chicago police shirts and the "back the blue" lights at his house. At the Dirksen Federal Building he was put in a cell with his brother and released that afternoon. With the press waiting out front, the brothers left by a back door.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

304. Mr. Leyden was charged in United States v. Leyden, No. 1:22-cr-00314-TNM (D.D.C.), with assaulting, resisting, or impeding officers, civil disorder, and restricted-grounds offenses. Upon information and belief, the government's video of him lasted about four seconds and appears to show a man behind him pushing him forward. Knowing he could not get a fair trial in Washington, he pleaded guilty on May 23, 2023. On September 6, 2023, Judge Trevor N. McFadden sentenced him to six months in prison, twelve months of supervision, forty hours of community service and $2,000 in restitution. His lawyer cost $25,000, and about thirty family members and friends paid their own way to be at his sentencing.

305. Mr. Leyden surrendered at the Federal Correctional Institution in Oxford, Wisconsin, on October 25, 2023. Although his injuries entitled him to a bottom bunk, he was assigned a top bunk in every cell, and climbing over the bunk posts struck his umbilical hernia again and again. He saw the doctor several times without relief, once could not move until a sergeant brought a nurse, and developed a hiatal hernia. He was strip-searched three times. His paperwork listed no counselor and no destination unit, and he believes he was deliberately celled with a man staff expected him to fight; the two got along.

306. One morning his cellmate woke him to say he was wanted at the "barbershop"—a urine test—moments after he had used the bathroom. He drank about nine cups of water and still could not produce a sample in time. For that, he was put first in a freezing isolation cell and then in the Special Housing Unit, facing up to three months there. In the SHU he was given his CPAP machine but not his medical mouth guard, and he cracked a lower right tooth. His requests for medical care went unanswered. On the day of his release his jaw was swollen and he was choking and vomiting.

307. He was also moved to a dormitory unit where prisoners were locked in at night with no toilet, and was held in a cell that, by his own count of the cinder blocks, was smaller than the law allows. His written grievances were denied. He was released on March 8, 2024.

308. The case reached his whole family. His wife took her nameplate off her desk at work so that co-workers would not see the name Leyden, and stopped walking with the neighbors. A neighbor chased his daughter Kylee down the street to question her about January 6th. Both of his daughters have needed counseling. Neighbors asked him whether he was going to jail; he now speaks to one or two people on a block where he once knew nearly everyone. At weddings and funerals, his brothers warned him away from certain relatives. His parents, eighty-nine and eighty-seven, learned to watch what they said to the people they met on their walks.

309. Mr. Leyden's prosecution terminated in his favor with the pardon of January 20, 2025. His DNA remains in the government's possession.

**Guy W. Reffitt**

310. The Plaintiff Guy Wesley Reffitt lives in Texas with his wife. Before these events he had a career of more than twenty years that took him around the world.

311. Mr. Reffitt walked from the Ellipse to the Capitol and reached the grounds at about 1:39 p.m. on January 6, 2021. There were no barriers where he came in, and the crowd was so thick he could barely make his way forward. Before Mr. Reffitt reached the building he was shot with pepper balls—by his count twenty-two times—and sprayed in the face by an officer; the judge in his case later described him as having been "blasted" in the face. When Mr. Reffitt could see again, he went back to his hotel, washed the chemicals from his face with milk, and left for home the next day.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

312. A 2016 examination documented Mr. Reffitt's 20/20 distance vision. Since January 6th he cannot see without glasses.

313. Mr. Reffitt's own son, whom the FBI baited into making false statements and turned against Mr. Reffitt, reported Mr. Reffitt to the FBI on January 10, 2021. On January 16, 2021, agents raided Mr. Reffitt's home with armored vehicles and a helicopter and pointed guns at everyone in the house, including Mr. Reffitt's wife and children. He was driven away in a squad car. He was first accused of possessing a homemade suppressor; that charge was dropped and then brought again in 2022, and it hung over Mr. Reffitt for years.

314. In jail Mr. Reffitt was held in isolation and was not given his medication. At about 1 a.m. on January 22, 2021, Mr. Reffitt collapsed and was rushed to intensive care with critically low sodium and potassium. He remained in intensive care until January 25, 2021. In March 2021 he was moved to the District of Columbia jail, where he spent more than 227 days in solitary confinement, locked down twenty-two to twenty-four hours a day. From August 13 to September 17, 2021, he spent thirty-five days in "the hole" without any charge. He was not permitted to shave until trial. Guards pepper-sprayed the unit and locked it down for weeks at a time for no legitimate reason. He remained in custody from his arrest on January 16, 2021, through the start of his trial on February 28, 2022.

315. Mr. Reffitt was indicted on January 27, 2021, in United States v. Reffitt, No. 1:21-cr-00032-DLF (D.D.C.). The government then superseded the indictment twice, in June and September 2021, adding charges and weapon enhancements, before taking him to the first January 6th jury trial. On March 8, 2022, a jury convicted Mr. Reffitt of all five counts, including a bogus charge of obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2). On August 1, 2022, Mr. Reffitt was sentenced to eighty-seven months in prison and three years of supervised release.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

After the Supreme Court's decision in *Fischer v. United States* narrowed the scope of § 1512(c)(2), he was resentenced on December 6, 2024, to eighty months.

316. After sentencing, the Bureau of Prisons moved Mr. Reffitt again and again—to the federal transfer center in Oklahoma, where he spent a week in the SHU locked down twenty-four hours a day, then to other jails in Oklahoma, El Paso, north Texas, Kentucky and Missouri—until the pardon of January 20, 2025. Throughout his custody he was denied care for his eyes. His phones and computers were returned with cracked screens.

317. Mr. Reffitt's career is over. The family's rental house is gone, their home was sold, his truck was repossessed and his credit destroyed. He and his wife moved in with their children and now live in a camper, traveling for work. His wife and daughters received sexual and death threats that he was powerless to stop. He is still rebuilding his relationship with his son.

318. Mr. Reffitt's prosecution terminated in his favor with the pardon of January 20, 2025. His telephones and computers were returned damaged, and his DNA and iris scans remain in the government's possession.

**Matthew L. Stickney**

319. The Plaintiff Matthew L. Stickney lives in Washington State with his wife, their daughter, and the son he adopted. He works in the engineering department of a large commercial real-estate firm. His late father was active in Washington State politics for many years.

320. Mr. Stickney flew to Washington for the rally and met a childhood friend from Virginia whom he had not seen in years. On January 6, 2021, they arrived late and saw the end of the speech, then walked with the crowd toward the Capitol. When they got there, police were firing smoke and tear gas into the crowd; Mr. Stickney was hit badly in the eyes and lost his friend. He



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

followed other people up the steps and into the Senate side of the building, was inside about twenty minutes, and left to look for his friend.

321. Upon information and belief, beginning in about May 2021 the FBI staked out Mr. Stickney's apartment and later his new apartment. The government obtained his flight records, the location data from his phones, and his Google search history by warrant. In late 2022 or early 2023, on a family trip to Hawaii, Mr. Stickney, his wife and his two-year-old son were delayed nearly an hour at the ticket counter and then searched three separate times before boarding—at the counter, at the security checkpoint while a man with a badge stood watching, and at the gate in front of everyone waiting for the flight. A TSA officer, bewildered, asked whether they had traveled to Saudi Arabia. They were searched again on the way home, and the plane then sat on the tarmac for about an hour while Mr. Stickney wondered whether he was about to be arrested in front of his family.

322. Mr. Stickney's wife is from Peru, and the couple, who married in October 2022, were going through her immigration process. In December 2023 he received a call telling them their immigration interview was ready. It was an FBI sting. On December 20, 2023—five days before Christmas—the couple arrived at the immigration office expecting a happy day, were led through a set of double doors, and were met by FBI agents and police who told Mr. Stickney he was under arrest. His wife was terrified. He went peacefully.

323. Sitting in the car in handcuffs and shackles, Mr. Stickney was told by an agent holding his phone that he could give her the passcode or they would break into it anyway; he gave it to her. He was taken in restraints to a holding cell in Seattle, held for several hours, swabbed for DNA, and released that day. The FBI kept his phone for more than a year, until after the pardon.

324. Mr. Stickney was charged in No. 1:23-mj-00356-GMH (D.D.C.) with four misdemeanors. As conditions of release he could not leave the state without notifying the court and was subject to drug testing at any time, and he had to turn his firearms over to his father. Within weeks of his arrest, a child-welfare worker and a plainclothes officer came to his apartment in the middle of the day while he was home alone with his son and spent up to an hour going through it, looking for weapons and assessing whether he was a fit father.

325. His employer put him on administrative leave for three months while he waited to learn whether he would be fired. News articles quoted his search history out of context, and they are the first thing anyone finds when they search his name.

326. The government offered him a plea and threatened to add a charge if he refused. He refused, and on June 10, 2024, the government vindictively superseded the charges to add a fifth count. He was pressured by the knowledge that January 6th defendants who went to trial were almost always convicted and that he could face two or three years in prison. His wife was pregnant, and he understood that if he was convicted he would likely miss the birth of his only biological child; he still would not plead guilty to something he did not believe he had done. His lawyer, who took his case without charge after he had already paid a first lawyer several thousand dollars, became seriously ill, and the trial was postponed past the inauguration.

327. After the pardon, all counts against Mr. Stickney were dismissed with prejudice before his April 2025 trial date.

328. Mr. Stickney has been diagnosed with anxiety. For years he lived in a state of fight or flight, afraid even to see a doctor for fear of what might be overheard, convinced his phone was monitored. He calls it the darkest period of his life. He remains on the SSSS list.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

329. Mr. Stickney's prosecution terminated in his favor when every count against him was dismissed with prejudice. The government kept his telephone for more than a year, forcing him to replace it, and his DNA remains in the government's possession.

330. As a direct result of these malicious, selective, and vindictive prosecutions, each of the Plaintiffs suffered severe damages, including loss of liberty (incarceration or pretrial detention), loss of employment and income, emotional distress, reputational harm, legal defense costs exceeding hundreds of thousands of dollars, and ongoing collateral consequences.

331. The criminal proceedings have terminated in all the Plaintiffs' favor.

## CLAIMS FOR RELIEF

### Count I – Malicious Prosecution
### (FTCA: All the Plaintiffs Against United States)

332. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 331 above and incorporate them in this Count as though they are fully restated herein.

333. United States' employees (including all the officials described above) initiated criminal proceedings against all of the Plaintiffs.

334. The proceedings were initiated without probable cause.

335. The proceedings were continued with actual malice and for improper purposes (political persecution, retaliation, and deterrence of protected First Amendment activity).

336. The proceedings terminated in the Plaintiffs' favor.

337. The Plaintiffs suffered damages as a direct and proximate result.

338. The United States is liable under the FTCA for these torts committed by its investigative and law enforcement officers within the scope of their employment. 28 U.S.C. § 2680(h). The United States' officers and agents fabricated and exaggerated evidence, withheld



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

exculpatory material, and pursued the cases despite the absence of probable cause that the Plaintiffs had committed the crimes alleged.

339. The criminal proceedings have terminated in the Plaintiffs' favor through acquittals, dismissals, and presidential pardons issued on January 20, 2025, which constitutes a favorable termination for purposes of a malicious-prosecution claim.

340. As a direct and proximate result of the Government's tortious conduct, each Plaintiff has suffered and continues to suffer damages in excess of $1 million, including but not limited to medical expenses, lost wages, pain and suffering, emotional distress, loss of liberty, loss of consortium, and other consequential damages.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

h. Order destruction of all DNA, blood, and other identifying biological information.

**Count II – Selective Prosecution/Abuse of Process**
**(FTCA – All Plaintiffs Against United States)**

341. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 331 above and incorporate them in this Count as though they are fully restated herein.

342. The United States used the legal process improperly (to wit: criminal prosecutions) in a manner that is not justified by the underlying legal action.

343. The United States had ulterior motives and used the legal system to harass, intimidate, coerce, and inflict emotional distress upon the Plaintiffs rather than to achieve a legitimate legal objective.

344. The Plaintiffs suffered harm as a result of the misuse of the legal process. This harm included economic injury, emotional distress, and other damages as described in this complaint.

345. The Defendant United States acted intentionally or with a reckless disregard for the consequences of its actions.

346. The prosecutions described in this complaint were selectively and vindictively initiated, maintained, and pursued against the Plaintiffs because of the Plaintiffs' political affiliation, viewpoint, and association with the Trump candidacy or movement, while similarly situated individuals of opposing political views were not prosecuted. This constitutes selective and vindictive prosecution and abuse of process under District of Columbia common law and violates the Fifth Amendment's equal protection and due process guarantees.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

347. As a result of the conduct of the United States' employees, the Plaintiffs have suffered emotional distress.

348. The conduct of the above-named employees, including the police, prosecutors, judges, and prison officials, was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

349. The conduct of the United States' employees regarding each Plaintiff was such that it would arouse resentment against the United States in an average member of the community in which the conduct occurred and lead that person to exclaim, "Outrageous!"

350. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer, physical and mental injury, including, but not limited to, (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

351. The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.

**Count III - Federal Tort Claims Act – Negligence involving Personal Property**
**(All Plaintiffs Against the United States of America)**

352. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 331 above and incorporate them in this Count as though they are fully restated herein.

353. The United States had a duty to exercise reasonable care in handling the Plaintiffs' seized property.

354. The FBI, an agency of the United States government, seized the Plaintiffs' personal property following the events of January 6, 2021.

355. The FBI seized cell phones, computers, mail, and other items of property from the Plaintiffs.

356. The United States breached its duty by failing to exercise reasonable care in handling the Plaintiffs' property.

357. While in federal custody, the Plaintiffs' property was damaged, lost, or stolen.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

358. The United States' breach of its duty caused damage to, loss of, or theft of the Plaintiffs’ property.

359. As a direct and proximate result of the United States' breach of its duty, the Plaintiffs have suffered damages in the amounts to be established at trial.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs’ property violated the Plaintiffs’ constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys’ fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.

**<u>Count IV - Federal Tort Claims Act – Intentional Infliction of Emotional Distress</u>**
**(All Plaintiffs Against the United States of America)**

360. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 331 above and incorporate them in this Count as though they are fully restated herein.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

361. The United States and its officers described in Paragraphs 1 through 331 engaged in extreme and outrageous conduct.

362. The United States' officers engaged in this conduct intentionally.

363. The Plaintiffs each suffered public ridicule, mockery, and severe humiliation from being branded as insurrectionists, rioters, anti-American, seditionists, traitors, and violent individuals. The label "J6er" was besmirched and attached to the Plaintiffs with negative ramifications. The Plaintiffs have suffered emotional pain, loss of enjoyment of life, lost income, loss of choices in earning a living, and lost revenue from failed businesses and unobtainable employment as a result of this branding, imprisonment, and wrongful arrest.

364. The conduct of the conspirators was outrageous.

365. As a result of the conduct of the United States' employees, the Plaintiffs have suffered emotional distress.

366. The conduct of the above-named employees, including the police, prosecutors, judges, and prison officials, was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

367. The conduct of the United States' employees regarding each Plaintiff was such that it would arouse resentment against the United States in an average member of the community in which the conduct occurred and lead that person to exclaim, "Outrageous!"

368. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer, physical and mental injury, including, but not limited to, (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5)



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

369. The United States' conduct caused the Plaintiffs to have severe emotional distress.

370. The Plaintiffs demand trial to present evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

**<u>Count V – Abuse of Process/Vindictive Prosecution</u>**
**(FTCA – All Plaintiffs Against the United States)**

371. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 331 above and incorporate them in this Count as though they are fully restated herein.

372. The United States and its prosecutors retaliated against the Plaintiffs for defending themselves by filing vindictive, malicious, bogus superseding felony indictments or punishing them for exercising their constitutional rights.

373. This was in accordance with a knowingly unconstitutional pattern and practice of the Garland Justice Department in J6 cases. The majority of J6ers who exercised their right to misdemeanor trials were similarly punished with false felony charges.

374. Word of this unconstitutional program and abuse of process spread widely among J6ers, compelling other accused J6ers to falsely plead guilty to crimes they didn't commit.

375. The United States implemented, directed, or failed to adequately train and supervise a policy, custom, or practice within the DOJ and U.S. Attorney's Office for the District of Columbia whereby federal prosecutors were encouraged or permitted to file superseding indictments adding felony charges against January 6 criminal defendants who were initially charged only with misdemeanors and who refused to plead guilty and instead demanded their constitutional right to trial.

376. This policy constituted abuse of process and vindictive prosecution in violation of the Fifth Amendment's Due Process Clause and was the moving force behind the unconstitutional actions against the Plaintiffs.

377. These false felony prosecutions were vindictively initiated and pursued against the majority of similarly situated J6 criminal defendants because they exercised their constitutional right to refuse a misdemeanor plea and demand a trial. Messrs. Garland and Graves, through



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

unwritten policy, custom, directive, or deliberate indifference in training and supervision, caused federal prosecutors to file superseding false felony indictments in retaliation. Garland and Graves failed to properly train and supervise prosecutors regarding the prohibition on retaliatory charging decisions, despite the obvious risk of tortious and constitutional injury.

378. In each case, the criminal proceeding terminated in the Plaintiffs' favor, either by dismissal, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.

379. The United States is liable under the FTCA for these torts (abuse of process and malicious prosecution) committed by its investigative and law enforcement officers within the scope of their employment. 28 U.S.C. § 2680(h).

380. In essence, this insidious practice deprived J6ers of their constitutional right to demand that allegations be subjected to fair adversarial trials.

381. As a result of the conduct of the United States' employees, the Plaintiffs have suffered emotional distress.

382. The conduct of the above-named employees, including the police, prosecutors, judges, and prison officials, was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

383. The conduct of the United States' employees regarding each Plaintiff was such that it would arouse resentment against the United States in an average member of the community in which the conduct occurred and lead that person to exclaim, "Outrageous!"

384. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer, physical and mental



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

injury, including, but not limited to, (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

385. The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

**Count VI - Tortious Civil Conspiracy (under law of District of Columbia)**
**(All Plaintiffs versus the United States of America)**

386. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 331 above and incorporate them in this Count as though they are fully restated herein.

387. The United States and its officers described in Paragraphs 1 through 331 cooperated and reached a meeting of the minds between two or more of its officers to commit a wrongful act, and an overt act in furtherance, resulting in damages.

388. The United States is liable for the tortious conspiracy of its employees, including all branches of government, which resulted in the wrongful arrest, the wrongful imprisonment, the wrongful branding as criminals, insurrectionists, seditionists, traitors, impeding their rights by such labeling or by making records and including the Plaintiffs on lists which made it difficult to travel, to run a business, or to earn a living.

389. Wrongful acts by the United States include Malicious Prosecution, Abuse of Process, Intentional Infliction of Emotional Distress, and Trespass to Chattels.

390. Overt acts by United States officers include:

a. Brady violations and the withholding of exculpatory evidence on a mass scale.

b. Unlawful searches and seizures (and trespasses) based on bogus general "geofence warrants" whereby the government seized every cell phone number at the Capitol on January 6th.

c. Falsifying evidence and the notion that the Secret Service had restricted vast areas of the U.S. Capitol on January 6, 2021—while knowing the Secret Service had never imposed such restrictions.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

d. Intentionally destroying, stealing, or breaking the property of J6ers, including that of the Plaintiffs.

e. The imposition of a bogus "obstruction of official proceedings" statute, knowing that the statute was never intended to apply to disorderly conduct by protestors.

f. The rigging of trials so that J6ers could not prevail.

g. The false placement of court venue in the courthouse where every judge in the courthouse was an interested witness to the events.

h. The burying of terabytes of discovery in databases which were inaccessible to the vast majority of J6ers.

i. The control and monitoring of defense attorneys' use of discovery databases.

j. The monitoring of attorney/client communications of J6ers.

k. The concealment of hundreds of undercover government operators and provocateurs among the crowds on January 6th.

391. As a result of the conduct of the United States' employees, the Plaintiffs have suffered emotional distress.

392. The conduct of the above-named employees, including the police, prosecutors, judges, and prison officials, was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

393. The conduct of the United States' employees regarding each Plaintiff was such that it would arouse resentment against the United States in an average member of the community in which the conduct occurred and lead that person to exclaim, "Outrageous!"



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

394. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer, physical and mental injury, including, but not limited to, (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

395. The United States' conduct caused the Plaintiffs to have severe emotional distress.

396. The Plaintiffs demand trial to present evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Respectfully submitted, Dated: October 21, 2026

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (954) 570-6757

_/s/ *Peter Ticktin*________
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
Serv512@LegalBrains.com
ROGER ROOTS, ESQUIRE
Rhode Island Bar No. 6752
Serv517@LegalBrains.com